STATE of South Dakota, Plaintiff
and Appellee,

v.

Robert THOMPSON, Defendant
and Appellant.

No. 14406.

Supreme Court of South Dakota.

Considered on Briefs May 24, 1984.

Decided Sept. 26, 1984.

Harold H. Deering, Jr., Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Robert Thompson, pro se.

HENDERSON, Justice.

This is an appeal from the circuit court's affirmation of a judgment of conviction for illegal possession and use of a gill net rendered by the Magistrate Court, Charles Mix County, South Dakota. We affirm.

Appellant is an enrolled member of the Yankton Sioux Tribe, and holds a tribal license to commercially fish within the boundaries of the Yankton Sioux Reservation. On July 23, 1981, appellant was fishing on Lake Francis Case in an area originally included in the Yankton Sioux Reservation boundaries, but which had been ceded by agreement dated 1894. He was arrested and charged with the crime of Illegal Possession and Use of a Gill Net, in violation of SDCL 41–12–9. Appellant pleaded not guilty to the charge, insisting that the trial court lacked jurisdiction over the matter. Trial was held to a law-trained magistrate upon stipulated facts on October 29, 1982, appellant appearing pro se. The court found jurisdiction. A judgment of guilt was entered against appellant on February 7, 1983, and a fine of $25 and court costs was assessed.

Appeal was taken to the Circuit Court, First Judicial Circuit, which affirmed the judgment on September 28, 1983. Notice of Appeal to this Court was filed on November 2, 1983, raising three issues. They are:

1) IS THE YANKTON SIOUX RESERVATION DISESTABLISHED?

2) IF SO, DID DISESTABLISHMENT ENTAIL ABROGATION OF THE YANKTON SIOUX'S HUNTING AND FISHING RIGHTS; AND

3) DO THE YANKTON SIOUX RETAIN AN INTEREST IN THE RIVERBED OF THE MISSOURI RIVER?

The Yankton Sioux Reservation was created by the Treaty of April 19, 1858, 11 Stat. 743, which was ratified February 16, 1859, by Proclamation February 26, 1859, found in Vol. 1 SDCL at 75. The Yankton Tribe and the United States thereafter entered into an agreement, Act of August 15, 1894, 28 Stat. 286,314, Vol. 1 SDCL at 139, whereby the Tribe sold a portion of its reservation to the United States. Critical language in that agreement stated:

### ARTICLE I.

The Yankton tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid.

### ARTICLE II.

In consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000), as hereinbefore provided for.

Act of August 15, 1894, 28 Stat. 286, Vol. 1 SDCL at 140.

### I.

In *State v. Williamson*, 87 S.D. 512, 211 N.W.2d 182 (1973), this Court held that the Act of 1894 disestablished that portion of the Yankton Sioux Reservation which was ceded and sold.

It is our opinion that this agreement, the Act of 1894, clearly, by its own terms, was an outright cession and sale by the Yankton Tribe of its unallotted lands within the reservation to the United States.... Where a tribe sells and the United States pays for all tribal interests, nothing is left in the tribe. It is an absolute conveyance. The land is severed from the reservation and is no longer "Indian Country".

*Williamson*, 87 S.D. at 515, 211 N.W.2d at 183–84. This holding was affirmed in *State v. Winckler*, 260 N.W.2d 356 (S.D. 1977). Further, in *State v. Hero*, 282 N.W.2d 70, 71 (S.D.1979), it was considered "logical to conclude that the cession of 'all ... claim, title, and interest of every kind and character' would include any claim to hunting rights." Citing the Court of Appeals in *Rosebud Sioux Tribe v. Kneip*, 521 F.2d 87, 94 (8th Cir.1975), *Hero* continued:

The language employed, "cede, surrender, grant and convey" leaves no doubt as to its meaning. There is a complete relinquishment of right, title, and claim. "It would be impossible," we have held of the words "ceded, conveyed, transferred, relinquished and surrendered," to select words operating more completely to *extinguish every vestige of Indian title*, and releasing the government more absolutely from every obligation, moral as well as legal.

*Id.* at 71 (emphasis in original). Relying on an analogous case, *United States v. State of Minnesota*, 466 F.Supp. 1382, 1385 (D.Minn.1979), this Court further indicated "the cessions not only extinguished Indian title to the ceded areas, but also had the concomitant 'effect of abrogating any aboriginal hunting, fishing, trapping, or wild ricing rights' on those lands." *Hero*, 282 N.W.2d at 72. The Eighth Circuit Court of Appeals affirmed the Minnesota holding in *Red Lake Band of Chippewa Indians v. State of Minnesota*, 614 F.2d 1161 (8th Cir.1980).

Appellant contends that in light of the Eighth Circuit Court of Appeals' decision in *Lower Brule Sioux Tribe v. State of South Dakota*, 711 F.2d 809 (8th Cir.1983), this Court should overrule *Williamson* and find that the Yankton Sioux Reservation was not disestablished by the Act of 1894. Therefore, appellant reasons that no hunting and fishing rights have been abrogated by the Indians, and the Tribe, not the State, has sole jurisdiction over fishing in the area wherein appellant was arrested.

■ The conclusion that an Indian reservation has been terminated is not to be lightly made. "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300, 314 (1975). The Congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history. *Id.* In *DeCoteau*, the United States Supreme Court held that the Lake Traverse Indian Reservation had been disestablished by an Act of Congress in 1891 ratifying an agreement between the United States and the Sisseton-Wahpeton Sioux Indians similar to the agreement with the Yankton Sioux. Convincing language, "precisely suited" to a conveyance of the entire interest was "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands ...." *DeCoteau*, 420 U.S. at 445, 95 S.Ct. at 1093, 43 L.Ed.2d at 314. Similar language was dispositive in a finding of diminishment of the Rosebud Reservation in *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

Though the decision in *Williamson* was prior to these cases, the method employed for determining whether or not the reservation had been disestablished was the same. Appellant has shown no error of reasoning in the *Williamson* case, nor additional facts or circumstances which would force this Court to reconsider *Williamson*

and overrule its determination. The case of *Lower Brule*, upon which appellant solely relies, is distinguishable.

The Lower Brule Sioux Reservation was established in 1889 and remained intact until sometime between 1954 and 1962 when the United States acquired portions of it along the Missouri River for the Fort Randall and Big Bend projects. The question in that case was whether the acts authorizing these projects diminished the reservation. The Eighth Circuit Court of Appeals held in the negative. Language in both acts "falls short of that utilized by Congress when it has unequivocally expressed its intent to disestablish a reservation's boundaries." *Lower Brule*, 711 F.2d at 817. Further, because the land was taken for purposes of constructing a dam and reservoir, continued Indian control of the land was not found inconsistent with the federal government's purpose in acquiring the property. This was to be distinguished from a case where, for example, the reservation was acquired to permit settlement by non-Indians.

■ Thus, the Eighth Circuit Court, itself, distinguished such cases as *Williamson*, *Kneip*, and *DeCoteau* where the Tribes' rights had been abrogated by Congressional action opening up the reservation to non-Indian settlement, in clear language of conveyance. Further, the Eighth Circuit Court conceded that should they find disestablishment, "the application of state law on the land taken ... no longer would be preempted, and South Dakota would have jurisdiction to regulate hunting and fishing by tribal members on that land absent federal law preserving the Indians' treaty hunting and fishing rights." *Lower Brule*, 711 F.2d at 815.

Clearly, *Lower Brule* can be distinguished and has no application to the present dispute. We accordingly affirm the jurisdictional finding.

II.

Appellant next contends that even if it is established that the Indians conveyed all of

their interest in the unallotted lands by Act of 1894, there was no conveyance of the Missouri riverbed. Thus, the Yankton Sioux retained all of their interest in and to the riverbed.

█ This argument is based on an assumption that when the reservation was formed, the United States included the riverbed as part of its boundaries. This assumption is without merit.

> [C]onveyance by the United States of land riparian to a *navigable* river carries no interest in the riverbed. Rather, the ownership of land under navigable waters is an incident of sovereignty. As a general principle, the Federal Government holds such lands in trust for future States, to be granted to such States when they enter the Union and assume sovereignty on an "equal footing" with the established States. After a State enters the Union, title to the land is governed by state law.... A court deciding a question of title to the bed of a navigable water must, therefore, begin with a strong presumption against conveyance by the United States, and must not infer such a conveyance "unless the intention was definitely declared or otherwise made plain," or was rendered "in clear and especial words," or "unless the claim confirmed in terms embraces the land under the waters of the stream[.]"

*Montana v. United States*, 450 U.S. 544, 551–52, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493, 501–02 (1981) (emphasis in original) (citations omitted).

The Treaty of 1858 designating the Yankton Sioux Reservation describes the land as follows:

> Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending *up* the Missouri River thirty miles; thence due north to a point ... thence easterly to a point on the said Chouteau River; thence *down* said river to the place of beginning, so as to include the said quantity of four hundred thousand acres. (Emphasis supplied.)

Treaty of April 19, 1858, 11 Stat. 743, Vol. 1 SDCL at 76. Such language does not evince a definite and clear intent to convey the land under the waters. An example of what might constitute convincing language may be found in the 1889 agreement establishing the Lower Brule Reservation, which set the eastern boundary at "the center of the main channel of the Missouri River." *Lower Brule*, 711 F.2d at 813. Clearly, the Yankton Sioux Reservation bordered the Missouri River, but did not include it.

The strong presumption against conveyance of the riverbed has not been overcome. Title to the riverbed was passed to South Dakota upon statehood.

The circuit court's affirmation of conviction is affirmed.

FOSHEIM, C.J., WOLLMAN and MORGAN, JJ., and DUNN, Retired Justice, concur.

DUNN, Retired Justice, participating.

WUEST, Circuit Judge, Acting as Supreme Court Justice, not participating.