1997 SD 14

**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Fred GREGER, Defendant and Appellant.**

No. 19087.

Supreme Court of South Dakota.

Argued Oct. 24, 1996.

Decided Feb. 19, 1997.

Mark W. Barnett, Atty. Gen., John P. Guhin, Roxanne Giedd, Sherri Sundem Wald, Asst. Attys. Gen., Pierre, for plaintiff and appellee.

Thomas J. Deadrick, Platte, for defendant and appellant.

Timothy R. Whalen, Charles Mix County State's Atty., Lake Andes, Tom D. Tobin of Tobin Law Offices, Winner, for amicus curie Charles Mix County.

KONENKAMP, Justice.

### Preface

[¶ 1] In an Agreement with the United States dated December 31, 1892, the Yankton Sioux Tribe "ceded, sold, relinquished and conveyed" all its unallotted reservation land

for a "sum certain" of $600,000. Under firmly established doctrine, these words of absolute conveyance create a "nearly insurmountable presumption" that the reservation was diminished. Nevertheless, will the original boundaries remain intact because the Agreement further stated "all provisions of the [earlier treaty establishing the reservation] shall be in full force and effect, the same as though this Agreement had not been made...."? We conclude that giving this excerpt unqualified primacy would make the remainder of the Agreement meaningless, but interpreted in context with the whole document, relevant contemporary circumstances, and congressional purpose, diminishment was plainly intended.

### Historical Overview

[¶ 2] Beginning in the late eighteenth and continuing through the mid-nineteenth century, the United States endeavored to exchange Indian lands in the east for regions further west. This "Indian removal" policy contemplated forging permanent tribal "homelands" in the western expanse. Various treaties created immense reservations designed to allow traditional ways of life to continue. Yet as immigration increased and pioneers advanced ever westward, settlers, railroaders, miners, and developers brought increasing pressure to further contain Indian tribes, calling for reservations to be opened for settlement and inevitably extinguished. Reformers hoping to improve the welfare of Indian people also sought to resolve the "Indian problem" through a plan of assimilation, encouraging Native Americans to become farmers and ranchers alongside homesteaders. Congress supervened with the Dawes Severalty Act (or General Allotment Act) of 1887, followed by a series of surplus land acts. With the allotment system, the homesteading ideal would be applied to "civilize" Indian people by forcing them onto individual plots cut out of reservations, while freeing unassigned lands for non-Indian settlement. Eventually, the allotment system was considered a failure. In 1934, the Indian Reorganization Act banned further allotments and restored remaining surplus lands to the tribes at the discretion of the Secretary of the Interior. Yet, this abandoned policy left perplexing jurisdictional problems, as Justice Thurgood Marshall chronicled in *Solem v. Bartlett*, 465 U.S. 463, 467–69, 104 S.Ct. 1161, 1164–65, 79 L.Ed.2d 443, 448–49 (1984)(footnotes and internal citations omitted):

The modern legacy of the surplus land Acts has been a spate of jurisdictional disputes between state and federal officials as to which sovereign has authority over lands that were opened by the Acts and have since passed out of Indian ownership. As a doctrinal matter, the States have jurisdiction over unallotted opened lands if the applicable surplus land Act freed that land of its reservation status and thereby diminished the reservation boundaries. On the other hand, federal, state, and tribal authorities share jurisdiction over these lands if the relevant surplus land Act did not diminish the existing Indian reservation because the entire opened area is Indian country under 18 U.S.C. § 1151(a)(1982 ed.).

Unfortunately, the surplus land Acts themselves seldom detail whether opened lands retained reservation status or were divested of all Indian interests. When the surplus land Acts were passed, the distinction seemed unimportant. The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century. Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians. Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries. See Act of June 25, 1948, ch. 645, 62 Stat. 757 (codified at 18 U.S.C. § 1151 (1982 ed.)).

Another reason why Congress did not concern itself with the effect of surplus land Acts on reservation boundaries was the turn-of-the-century assumption that Indian reservations were a thing of the past. Consistent with prevailing wisdom, Members of Congress voting on the surplus land Acts believed to a man that within a short time—within a generation at

most—the Indian tribes would enter traditional American society and the reservation system would cease to exist. Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation.

Although the Congresses that passed the surplus land Acts anticipated the imminent demise of the reservation and, in fact, passed the Acts partially to facilitate the process, we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land Act. Rather, it is settled law that some surplus land Acts diminished reservations . . . and other surplus land Acts did not. . . . The effect of any given surplus land Act depends on the language of the Act and the circumstances underlying its passage.

### *The Yankton Reservation*

[¶ 3] The 1858 Yankton Treaty of Cession created a 430,495–acre reservation along the eastern bank of the Missouri River for the Yankton Tribe. 11 Stat 743. Beginning in 1891, tracts within the reservation were allotted to individual Yankton Indians, leaving approximately 168,000 acres of unallotted land. The next year, in response to communications from the Tribe to the Secretary of the Interior, the United States appointed the Yankton Indian Commission to negotiate for the sale of the surplus lands. A specific enactment was passed "to enable the Secretary of the Interior in his discretion to negotiate with any Indians for the surrender of portions of their respective reservations. . . ." 27 Stat 120, 136.

[¶ 4] In their first meeting with the Commission, tribal members were urged to reflect on compelling realities:

The buffalo is gone, the antelope is gone, you can no longer live by hunting. You must plow like the white man. You must raise cattle to take the place of the buffalo; you must raise sheep to take the place of the antelope. You must raise wheat and

corn and oats to make bread and to feed your stock. You must raise everything which the white man raises and have plenty to eat and plenty to sell. Then you can build good houses where you can keep warm and dry and be comfortable. You can wear good warm clothes and have many comforts that will make you happy.

The Yanktons had suffered severe adversities over the years, as their ancestral ways of living dwindled away. John P. Williamson, a Presbyterian missionary who lived with the Yanktons for a quarter century, would later reflect in one of his annual reports:

The Indian's occupation is gone, so far as the Yanktons are concerned. Twenty-five years ago they lived by the chase. Herds of buffalo numbering thousands ranged on the vast plains which were the hunting grounds of the Yanktons. From them they secured food, clothing and teepees, the three great objects of all industry. Now the white man has covered these vast plains with his wheat fields and herds of tame cattle, and the buffalo are no more. Never more suddenly has a ready people lost their entire means of support.

Commissioner John J. Cole explained to tribal members at one of the negotiation councils:

The Great White Father . . . wants you to sell your surplus lands for which you have no use. If you want to sell these surplus lands we will buy them and pay you all they are worth, and the Government will sell them to men who will make homes on them and will build good houses and make good farms, and this will make your other lands—your homes—worth more than all your lands are now worth, and what you get from the Government for the surplus lands will be a clear gain to you.

During their meetings, both the Yanktons and the Commission members equated this proposed sale with the 1858 Treaty when the Yanktons renounced ownership of any other lands claimed in the past. After months of negotiation, a majority of the male tribal members and the Commission reached agreement.[1] The first two articles provided:

---

1. The Agreement had been "translated into the Dakota language for the use and consideration of the Yankton Sioux tribe." In accord with tradition, only males participated in this type of decision: 255 of the 458 eligible male members signed the Agreement.

### Article I.

The Yankton tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid.

### Article II.

In consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000), as hereinbefore provided for.

Congressional ratification was delayed due to allegations of impropriety in negotiations. In September 1893, the Commissioner of Indian Affairs sent a special United States Indian Inspector to the reservation who, after an investigation, concluded "no undue pressure was used or improper methods resorted to...." Many Yankton leaders knew well the import of their Agreement and were anxious to conclude it. In a petition dated March 2, 1894, to the Senate Indian Affairs Committee, 109 Yankton chiefs, headmen and tribal members urged quick congressional action, stating in part:

When we signed the treaty [1892 Agreement] we knew what we were doing for ourselves and for the Yankton tribe in general. We did sign it because we love and respect our families, for whom we expect a support could be made out of the sale of our surplus lands. We signed it because our old and infirm people and orphans are in the need of help and are just at the present time badly off in various ways....

By means of the treaty we want to encourage our churches and schools and have the people progress in enlightenment and civilization. We want the nation to take on new life by becoming good farmers and mechanics and professional men, and that they should all be good citizens of the United States.... We want the laws of the United States and the State that we live in to be recognized and observed. We do not think it is a proper thing to keep up the tribal relation—as the tribal relation on this reservation is an obstacle and hindrance to the advancement of civilization.[2]

Prospective settlers were also eager for the new land to become available. On February 15, 1894, the Yankton Press and Dakotan reported:

The prospect for the early opening of the Yankton reservation is causing quite a stir at Armour. Inquiries are pouring in from all directions, and the minute the bill passes congress there will be a rush to be on the ground.

During congressional floor debates, Representative Pickler of South Dakota reminded his fellow legislators, "The proposition that is before the House today is very simple. We are needing more lands for settlement. By an act of Congress we provided for sending out a commission to treat with the Yankton Sioux Indians for their reservation...." By due course, the bill ratifying the Agreement became law on August 15, 1894. President Grover Cleveland opened the reservation with the following proclamation:

Whereas ... certain articles of agreement were made and concluded at the Yankton Indian Agency ... whereby the said Yankton tribe of Sioux or Dacotah Indians, for the consideration therein mentioned, ceded, sold, relinquished, and conveyed to the United States, all their claim, right, title and interest in and to all the unallotted lands within the limits of the reservation set apart to said tribe by the [1858 Treaty]....

Thus, the unallotted lands were declared available for non-Indian settlement effective May 21, 1895. That same year, South Dakota took over civil and criminal jurisdiction in

---

2. This petition was attached to a report from Mr. Shoup of the Committee on Indian Affairs, which stated in part:

One of the greatest hindrances to the progress of these people in the past has been their tribal mode of life and ownership of land in common, and the issue of food and clothing to them by the Government.... The occupation of the land released by them by actual settlers under the homestead law bringing them in close contact with the frugal, moral, and industrious people who will settle there will stimulate individual effort and make their progress much more rapid than heretofore.

the region and has since continuously maintained it.[3] *Cf.* South Dakota Constitution, Art. XXVI, § 18, ¶ 2.

[¶ 5] Based upon the 1894 Act, the reservation reduced in size from a 410 square mile (430,495 acre) sanctuary down to what is presently scattered Indian holdings of approximately 40,000 acres. Indians and non-Indians alike have since referred to the Yankton Reservation as a "mile square."[4]

### Defendant's Offense

■ [¶ 6] Defendant, Fred Greger, is an enrolled member of the Yankton Sioux Tribe. On January 13, 1993, he and Ed Huerta were fighting in the Double D Bar in Wagner. When Huerta was escorted from the bar, defendant grabbed Huerta's wife, Lanae, and punched her in the face. The assault left her with a permanent facial scar, two missing teeth, and broken glasses. As a result, defendant was charged and convicted of aggravated assault. He raises two issues on appeal: (1) jurisdiction; and (2) violation of his Fifth Amendment privilege. Defendant believes the recent decision in *Yankton Sioux Tribe v. Southern Missouri Waste Management District*, 890 F.Supp. 878 (D.S.D.1995), *aff'd* 99 F.3d 1439 (8th Cir.1996), controls the jurisdictional issue in his case.[5] If the 1858 boundaries are still in existence, they would encompass Wagner.

### Discussion

[¶ 7] *I. Prior Decisions on the Status of the Yankton Reservation*

[¶ 8] In *Perrin v. United States*, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914), the Supreme Court designated the area now in question as "ceded lands formerly included in the Yankton Sioux Indian Reservation" when construing Article XVII, the section prohibiting liquor sales on ceded lands in the 1892 Agreement. *Id.* at 480, 34 S.Ct. at 388, 58 L.Ed. at 693. Referring to the "original reservation" as constituting 400,000 acres, the Court concluded federal jurisdiction existed beyond Indian country to enforce the alcohol prohibition, reasoning that "[i]f liquor is injurious to [Native Americans] inside a reservation, it is equally so outside of it. . . ." *Id.* at 484, 34 S.Ct. at 390, 58 L.Ed. at 695 (quoting *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 195, 23 L.Ed. 846, 848 (1876)).

> The chiefs doubtless saw, from the curtailment of their reservation, and the consequent restriction of the limits of the "Indian country," that ceded lands would be used to store liquors for sale to the young men of the tribe; and they well knew that, *if there was no cession, they were already sufficiently protected by the extent of their reservation.*

*Id.* (emphasis added). This holding clearly depends for its import on the diminishment

---

3. The Indian agent's report that year reflects some lingering questions over citizenship status:

> During the past year the unallotted lands of this reservation by Executive proclamation have been thrown open for settlement and thereby some complications as to a conflict of authority of the agent and the State authorities have arisen. . . . The elective franchise has not yet been extended to them by the State, nor have they been taxed; yet under the Dawes bill they are citizens, and as such are subject to the laws, both civil and criminal, of the State.

4. This refers to the tribal headquarters area at Marty. *See, e.g.,* 1932 tribal member petition. (Exhibit # 32). *See also* Superintendent's remarks concerning "mile square" area. (Exhibit # 632).

5. By stipulation, the parties incorporated the record from *Southern Missouri*. Hence, we have thoroughly reviewed its proceedings as well as the record in this case. We do not consider

ourselves bound, however, by the Eighth Circuit's decision, for as the United States Supreme Court held in *Asarco, Inc. v. Kadish*, 490 U.S. 605, 617, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696, 715 (1989):

> state courts . . . possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law. (Citations omitted). Indeed, inferior federal courts are not required to exist under Article III, and the Supremacy Clause explicitly states that "the Judges in every State shall be bound" by federal law. U.S. Const., Art. VI, cl. 2.

Surely, it is "within their power and their proper role [for state courts] to render binding judgments on issues of federal law, subject to review by this Court." *Asarco*, 490 U.S. at 620, 109 S.Ct. at 2047, 104 L.Ed.2d at 717. *But see St. Cloud v. Leapley*, 521 N.W.2d 118, 122 (S.D. 1994)(for purposes of federal criminal jurisdiction, we are bound by federal court interpretation of federal statute).

of reservation boundaries. Otherwise, there would have been no need for any legal inquiry to rationalize expanding federal jurisdiction into non-Indian regions. Of course, *Perrin's* notion of Indian country was consistent with the view at the time that reservations included "only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians." *Solem,* 465 U.S. at 468, 104 S.Ct. at 1165, 79 L.Ed.2d at 448. Nevertheless, since *Perrin,* the Supreme Court has continued to regard the reservation as diminished. *See Johnson v. Geralds,* 234 U.S. 422, 444–45, 34 S.Ct. 794, 802, 58 L.Ed. 1383, 1392 (1914)(referring to "ceded lands formerly included in the Yankton Sioux Indian Reservation in the State of South Dakota"); *United States v. Mazurie,* 419 U.S. 544, 554, 95 S.Ct. 710, 716, 42 L.Ed.2d 706, 715 (1975)("land [which] originally had been included in the Yankton Sioux Indian Reservation, but had been ceded to the United States").

[¶ 9] Lower federal courts have also recognized boundary diminishment. *See, e.g., Cihak v. United States,* 232 F. 551, 551 (8th Cir.1916); *Forman v. United States,* 256 F.2d 766, 767 (8th Cir.1958); *Weddell v. Meierhenry,* 636 F.2d 211, 213 n. 2 (8th Cir.1980), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981). *See also* the United States Court of Claims decision in *Yankton Sioux Tribe v. United States,* 224 Ct.Cl. 62, 623 F.2d 159, 165 (1980):

> These final boundaries of the Yankton Sioux Reservation were respected by [the tribe and the United States] for more than three decades up until the 1892 Agreement changed those boundaries by the cession at issue in this case.

[¶ 10] In addition, four times our Court found the reservation was diminished or disestablished. *Wood v. Jameson,* 81 S.D. 12, 15, 130 N.W.2d 95, 97 (1964)(the "operative language" of the 1892 Agreement provided that the "Yankton tribe for an agreed consideration did 'cede, sell, relinquish, and convey to the United States all their claim, right, title and interest ...' "). Citing *Perrin,* the *Wood* Court wrote "Construing the Indian treaty and the 1894 ratifying Act together we think it was the purpose of Congress to disestablish the reservation...." *Id.* at 19, 130 N.W.2d at 99. In *State v. Williamson,* 87 S.D. 512, 515, 211 N.W.2d 182, 184 (1973), we held "the Act of 1894 disestablished that portion of the Yankton Reservation which was ceded and sold to the United States...." Justices Wollman and Biegelmeier concurred and reflected that the 1894 Act "expresses a congressional determination to terminate the reservation status of the portion of the reservation ceded, sold, relinquished and conveyed to the United States by the Yankton Tribe." *See also State v. Winckler,* 260 N.W.2d 356, 360 (S.D.1977)(noting, "the Yankton Indian Reservation was disestablished"). Again in *State v. Thompson,* 355 N.W.2d 349 (S.D.1984), we adjudged that the two most critical factors in the 1894 Act, the "cession" and "sum certain" language, compelled a finding of diminishment.

[¶ 11] Diminishment of the Yankton Reservation has been challenged repeatedly; each time courts have answered with the same result, excepting only the most recent decision in *Southern Missouri.* Yet the matter appears resolved by the long series of decisions preceding it. Although the question of reservation diminishment is ultimately a matter of federal law, based upon this Court's analysis using standards established by the United States Supreme Court, we must regard the issue as settled. Nonetheless, to incorporate and comply with the Supreme Court's most recent holding in *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), we reevaluate the matter under its analysis.

[¶ 12] *II. Hagen Analysis*

[¶ 13] In *Hagen,* the Court retained its traditional approach to diminishment questions, which requires an examination of all the circumstances surrounding a reservation opening. *Id.* at 410–11, 114 S.Ct. at 965, 127 L.Ed.2d at 265. By looking to precedent which "established a fairly clean analytical structure," the Court concluded the Uintah Indian Reservation was diminished by Congress when it opened the reservation to non-Indian settlers. *Id.* (citing *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166, 79 L.Ed.2d at 450).

*Hagen* sets forth three factors for consideration:

> The most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands. *Ibid.* [citing *Solem,* 465 U.S. at 470, 104 S.Ct. at 1166, 79 L.Ed.2d at 450]. We have also considered the historical context surrounding the passage of the surplus land Acts, although we have been careful to distinguish between evidence of the contemporaneous understanding of the particular Act and matters occurring subsequent to the Act's passage. *Id.* at 471[, 104 S.Ct. at 1166–67, 79 L.Ed.2d at 451]. Finally, "[o]n a more pragmatic level, we have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation." *Ibid.* Throughout the inquiry, we resolve any ambiguities in favor of the Indians, and we will not lightly find diminishment. *Id.* at 470, 472[, 104 S.Ct. at 1166, 1167, 79 L.Ed.2d at 450, 451]; see also *South Dakota v. Bourland,* 508 U.S. 679, 687, [113 S.Ct. 2309, 2316, 124 L.Ed.2d 606, 618] (1993) (" '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.' " (quoting *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. 251, 269, [112 S.Ct. 683, 693, 116 L.Ed.2d 687, 704] (1992) (internal quotation marks omitted))).

*Hagen,* 510 U.S. at 411, 114 S.Ct. at 965, 127 L.Ed.2d at 265.[6] We examine each factor.

### A. Statutory Language

■ [¶ 14] Congress incorporated the entire 1892 Agreement into its ratifying enactment. We begin here because "statutory language used to open the Indian lands" is the most "probative evidence of diminishment. . . ." *Id.* Yet, we would search in vain for words like "diminishment" or "disestablishment" as such expressions were not terms of art at the time. *Solem,* 465 U.S. at 475 n. 17, 104 S.Ct. at 1168 n. 17, 79 L.Ed.2d at 453 n. 17. We must look, consequently, for other statutory language evincing "an express congressional purpose to diminish," *Solem,* 465 U.S. at 475, 104 S.Ct. at 1168–69, 79 L.Ed.2d at 453, but no particular form of words is required. *Hagen,* 510 U.S. at 411, 114 S.Ct. at 965, 127 L.Ed.2d at 265. To that end, we agree with the exhortation of the *Rosebud* Court, "as Mr. Justice (then Judge) Holmes commented, we are not free to say to Congress: 'We see what you are driving at, but you have not said it, and therefore we shall go on as before.' " *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 597, 97 S.Ct. 1361, 1368, 51 L.Ed.2d 660, 671 (quoting *Johnson v. United States,* 163 F. 30, 32 (1st Cir.1908)). Therefore, we analyze to determine whether there is "a statutory expression of congressional intent to diminish, [which,] coupled with the provision of a sum certain payment, would establish a nearly conclusive presumption that the reservation had been diminished." *Hagen,* 510 U.S. at 411, 114 S.Ct. at 965–66, 127 L.Ed.2d at 265. *See also Solem,* 465 U.S. at 470–71, 104 S.Ct. at 1166, 79 L.Ed.2d at 450 (noting that cession language, coupled with a commitment from Congress to compensate a tribe for land, created "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished").

■ [¶ 15] The operative language of the 1894 Act provided that Yankton tribal members did "cede, sell, relinquish, and convey to the United States *all* their *claim, right, title,* and *interest* in and to *all* the unallotted lands within the limits of the reservation" and that in consideration for the "lands ceded, sold, relinquished, and conveyed" the United States agreed to pay a sum certain of $600,-000. (Emphasis added). Nearly identical language signaled diminishment in *DeCoteau v. District County Ct.,* where the Court noted that such language was "precisely suited" to diminishment. 420 U.S. 425, 445, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300, 314 (1975). *Cf. Solem,* 465 U.S. at 473, 104 S.Ct. at 1167, 79 L.Ed.2d at 452 (noting that "sell and dispose"

---

**6.** While it is true that ambiguities are construed in favor of Indians, we are aware of the warning of the Supreme Court in *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774, 105 S.Ct. 3420, 3432, 87 L.Ed.2d 542, 558 (1985): "[C]ourts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' *Washington v. Washington Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. [658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823, 839 (1979)], clearly runs counter to a tribe's later claims."

language was not evidence of diminishment, while "cede, sell, relinquish and convey" constitutes such evidence).[7]

**[¶ 16]** Other passages bolster a finding of intent to diminish. In ratifying the 1892 Agreement, Congress added a provision requiring that "the sixteenth and thirty-sixth sections in each Congressional township ... shall be reserved for common-school purposes and be subject to the laws of the State of South Dakota." This language explicitly conforms to the enabling act granting statehood to South Dakota. The Act of February 22, 1889, admitting South Dakota to the Union (25 Stat 679 § 10) provided in part:

> [U]pon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States ... are hereby granted to said States for the support of common schools ...: Provided, That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants ... of this act, nor shall any land embraced in Indian, military, or other reservation of any character be subject to the grants ... of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.

From this same parallel statutory arrangement, the Court in *Rosebud* discerned

> a congressional intent to disestablish Gregory County from the Rosebud Reservation, thereby making the sections available for disposition to the State of South Dakota for "school sections" under § 10 of the Act of February 22, 1889.

430 U.S. at 601, 97 S.Ct. at 1370, 51 L.Ed.2d at 673.[8] The Court noted, "Congress, therefore, [in using such language] clearly thought that it was acting pursuant to § 10 of the Act of February 22, 1889, and not *sub silentio* adding an additional grant for school lands located within a continuing reservation." *Id.* at 600–01, 97 S.Ct. at 1370, 51 L.Ed.2d at 673.

---

7. *Compare United States v. Grey Bear*, 828 F.2d 1286 (8th Cir.1987), *vacated in part on other grounds on reh'g en banc*, 863 F.2d 572 (8th Cir.1988), *cert. denied*, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990). In *Grey Bear*, the Eighth Circuit Court of Appeals considered an act that contained cession language similar to that of the 1892 Yankton Agreement. 828 F.2d at 1290. However, it did not provide for a sum certain payment, so the court held that the "almost insurmountable presumption" of disestablishment was not present. The court noted:

> We agree with the district court's analysis that although the "cede, surrender, grant, and convey" language of the Act suggests congressional intent to disestablish the reservation boundaries, the Act does not contain an *unconditional* commitment by Congress to pay the tribe for the ceded lands. Compensation for the lands was not set at any fixed price and the tribe was guaranteed reimbursement only for the lands actually disposed of by the government.

*Id.* (citations omitted). This differs from the 1892 Yankton Agreement, as that document not only contained the cession language, but also provided for a sum certain of $600,000 for the sold land. *But see Hagen*, 510 U.S. at 412, 114 S.Ct. at 966, 127 L.Ed.2d at 265 ("While the provision for definite payment can certainly provide additional evidence of diminishment, the lack of such a provision does not lead to the contrary conclusion.").

8. Article VIII in the 1892 Agreement states "[s]uch part of the ceded surplus lands hereby ceded and sold to the United States as may now be occupied by the United States for agency, schools, and other purposes ... until they are no longer required for such purposes." A provision in the Cheyenne River Act in *Solem*, 465 U.S. at 474, 104 S.Ct. at 1168, 79 L.Ed.2d at 452–53, is somewhat similar, as the Secretary of the Interior could set aside land "for agency, school, and religious purposes, to remain reserved as long as needed, and as long as agency, school, or religious institutions are maintained thereon for the benefit of said Indians." *Id.* (citing 35 Stat 461). However, the difference between the Act in *Solem*, which was held to not have created diminishment, and the 1892 Yankton Agreement is that the Cheyenne River Act did not have the dispositive cession language which has been found to create diminishment in the past. *See, e.g., DeCoteau*, 420 U.S. at 445–46, 95 S.Ct. at 1093–94, 43 L.Ed.2d at 314–15. The *Solem* Court wrote, "Nowhere else in the [Cheyenne River] Act is there specific reference to the cession of Indian interests in the opened lands...." 465 U.S. at 474, 104 S.Ct. at 1168, 79 L.Ed.2d at 452. This is not the case in the 1892 Agreement, as we have noted, *supra*, that Article I provided the tribe would "cede, sell, relinquish, and convey" their lands to the United States. In addition, the provision at issue here refers to the "ceded surplus lands hereby ceded and sold." *See Article VIII supra.* Therefore, the *Solem* analysis regarding a somewhat similar provision is inapplicable to this case.

[¶ 17] President Cleveland's Proclamation mirrors the 1894 enactment using the same language so often interpreted as authoritative in signifying boundary diminishment: "the said Yankton tribe of Sioux or Dacotah Indians, for the consideration therein mentioned, *ceded, sold, relinquished, and conveyed* to the United States, *all their claim, right, title and interest in and to all* the unallotted lands within the limits of the reservation set apart to said tribe by the [1858 Treaty]. . . ." The Supreme Court has held that such language in a presidential proclamation is clear evidence of diminishment, as it is "an unambiguous, contemporaneous, statement, by the Nation's Chief Executive." *Rosebud,* 430 U.S. at 602, 97 S.Ct. at 1371, 51 L.Ed.2d at 674 ("*the said Indian tribe ceded, conveyed, transferred, relinquished, and surrendered, forever and absolutely, without any reservation whatsoever . . . all their claim, title, and interest of every kind and character .. .*"); *see also Hagen,* 510 U.S. at 420, 114 S.Ct. at 970, 127 L.Ed.2d at 270.

■ [¶ 18] Article XVII, the anti-liquor provision, notably distinguishes between reservation and ceded land:

> No intoxicating liquors nor other intoxicants shall ever be sold or given away upon *any of the lands by this agreement ceded and sold to the United States,* nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the treaty between the said Indians and the United States, dated April 19th, 1858, as afterwards surveyed and set off to the said Indians. (Emphasis added).

This terminology presupposes the ceded lands would not be part of the reservation. *Cf. Rosebud,* 430 U.S. at 613, 97 S.Ct. at 1376, 51 L.Ed.2d at 680–81. Moreover, in 1892, Congress enacted laws prohibiting alcohol sales on Indian reservations. Adding this clause to the Agreement was unnecessary unless the parties understood that the ceded lands would no longer be part of the reservation. Although the laws prohibiting alcohol on reservations were created only a short time before the negotiations began in 1892, and even if it can be said that the negotiators were unaware of the 1892 Act prohibiting liquor sales on reservations, if it means nothing else, clearly by this language

tribal members understood that without this Agreement the Tribe would have no control over commerce in alcohol on ceded lands. Finally, if the negotiators did not have the new alcohol prohibition statutes in mind, we can deduce that Congress knew of them when it passed the Act ratifying the Agreement, which included the no intoxicant provisions. *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275, 291 (1990)("We assume that Congress is aware of existing law when it passes legislation.").

■ [¶ 19] We come now to the crux of defendant's argument. He jettisons all previous judicial rulings on diminishment for having failed to consider Article XVIII in the 1892 Agreement.

### Article XVIII

Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858, between the Yankton tribe of Sioux Indians and the United States. And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made, and the said Yankton Indians shall continue to receive their annuities under the said treaty of April 19th, 1858.

Defendant believes that by expressing a clear intent to conserve all provisions of the 1858 Treaty, the article manifests a purpose to maintain the reservation's exterior boundaries as they were before the Agreement was ratified in 1894. A literal reading of this passage to the exclusion of the remainder, however, would force a conclusion even more extreme than simply reviving the 1858 boundaries: it would also impugn the entire sale. After all, the 1858 Treaty guaranteed to the Yankton Tribe "quiet and peaceful" possession of 430,495 acres. If Article XVIII is given overarching prominence, then no provision contrary to the 1858 Treaty can stand, and the 1892 Agreement along with the congressional enactment ratifying it are nullities.

[¶ 20] An understanding of the contemporary negotiations for the land purchase fur-

nishes insight on the reason for this provision and why its language was so absolute. Many tribal members were reluctant to sign the Agreement without solid reassurance they would not lose their annuities pledged in the 1858 Treaty. Professor Hoover [9] believes the reference to annuities was probably included "because during negotiations tribal members were led to believe that their annuity benefits might have been suspended had not a majority in the tribe acceded to the terms of the 1894 Agreement." The addition of the annuity language in the last sentence in Article XVIII seems to confirm the existence of these fears. Other promised financial entitlements were also discussed. For example, during the Great Sioux War, the Yankton Tribe had remained loyal to the United States, with some of its members acting as scouts for the Army. "Good scout" pay had been promised.[10] Yet history deplorably confirms the United States had not always kept its promises to Indian people. As one Yankton tribal member, White Swan, put it: "the Great Father has deceived us in many payments." A conflicting perception appears in the government negotiators' commentary: "The Indians, partly through ignorance and partly through craft, presented a long list of claims and grievances. They claim they had not received their dues under the Treaty of 1858 . . . ." Whatever the viewpoint, the record of negotiations is replete with Yankton concerns for obtaining unsatisfied monetary entitlements before selling their unallotted reservation land. Nevertheless, in the chronicles kept at the time, no mention is found respecting the preservation of reservation boundaries, keeping a tribal presence on ceded lands, or extending Indian dominion over white settlements, except with respect to the prohibition on the sale of liquor as discussed in *Perrin*. Was Article XVIII a rhetorical overstatement inserted to reassure tribal members of their monetary entitlements? We need not rely solely upon contemporary annals for an answer to such an imponderable. Long established legal principles put Article XVIII in its legitimate perspective.

[¶ 21] Although "legal ambiguities are resolved to the benefit of the Indians . . . [a] canon of construction is not a license to disregard clear expressions of tribal and congressional intent." *DeCoteau*, 420 U.S. at 447, 95 S.Ct. at 1094, 43 L.Ed.2d at 315; *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490, 498 (1986); *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766–70, 105 S.Ct. 3420, 3428–30, 87 L.Ed.2d 542, 553–55 (1985). Here, the canons reinforce our analysis. An age-old precept of contract interpretation requires that agreements be interpreted as a whole to give meaning to all terms, but when provisions conflict so that all cannot be given full weight, the more specific clauses are deemed to reflect the parties' intentions—a specific provision controls a general one. *Bock v. Perkins*, 139 U.S. 628, 634, 11 S.Ct. 677, 679, 35 L.Ed. 314, 316 (1891)("The particular description [in the contract] must control the . . . general description . . . ."). *See also Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)(one clause should not be read to render another inoperative). A definite intent was clearly expressed in the "cession and sum certain language" found in the congressionally approved Yankton Agreement. Articles I and II explicitly set

---

**9.** The only historian to offer an opinion on the question was Professor Herbert Hoover of the University of South Dakota, who testified on behalf of the Tribe in *Southern Missouri*. His testimony was included in this case by stipulation. Professor Hoover adds insightful details on the creation of the Yankton Reservation and the events surrounding the 1894 Act. He holds no doubt about the Tribe's continued sovereignty over the land in question, believing there is no evidence to support a contrary conclusion. He concedes only that, not being a lawyer, he is unable to perform a legal or case analysis.

**10.** In fact, in Article XV the claim of fifty-one scouts employed by General Sully in 1864 was recognized as just, thus the Agreement provided for the payment of additional compensation to them or their heirs. It apparently did not concern government negotiators to assert that this pay should be contingent upon the land sale. Yet as the Supreme Court noted in *DeCoteau*, despite what we now perceive as injustices, "we cannot remake history." 420 U.S. at 449, 95 S.Ct. at 1095, 43 L.Ed.2d at 317. This is not to say that negotiators had dishonest intentions. As Colonel Adams, one of the Commissioners, stated: "We want . . . your surplus lands, but we want to get it honorably."

forth, as the Supreme Court noted in another case, "a broad and unequivocal conveyance of the Tribe's title to the land and a surrender of '*all* their claim, *right*, title and interest *in and to*' that portion of the reservation. (Citation omitted). The ... Agreement thus was both a divestiture of the Tribe's ownership of the ceded lands and a diminution of the boundaries of the reservation within which the Tribe exercised its sovereignty." *Oregon Department of Fish and Wildlife,* 473 U.S. at 768, 105 S.Ct. at 3429, 87 L.Ed.2d at 554 (emphasis in original)(dealing with nearly identical divestiture language). Article XVIII only generally asserts the preeminence of the 1858 Treaty and in no way disavows the purpose of divestiture in Articles I and II.

[¶ 22] A similar savings clause in a reservation sale agreement was found not to have overridden the clear intent of the agreement to diminish boundaries. In the Agreement with the Crow Indians, one provision stated:

> That all existing provisions of the treaty of May seventh Anno Domini eighteen hundred and sixty-eight, and the agreement approved by act of Congress dated April eleventh, eighteen hundred and eighty-two, shall continue in force.

26 Stat 989, 1039–1040, § 31, Act of March 3, 1891, 1 Kappler 407, 432, 435, § "Fifteenth." The Supreme Court found, despite this clause, the 1891 Crow Tribe Agreement diminished the size of their reservation. *Montana v. United States,* 450 U.S. 544, 548, 101 S.Ct. 1245, 1249, 67 L.Ed.2d 493, 499 (1981); "An Act Accepting and Ratifying Agreement for Sale of a Portion of the Crow Indians of Montana Reservation," Ch 74, 22 Stat 42 (1882). *See also Rosebud v. Kneip,* 521 F.2d 87, 94 n. 21 (8th Cir.1975), *aff'd,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977)(savings clause held not to prevent diminishment); *Chippewa Indians of Minnesota v. United States,* 301 U.S. 358, 368–70, 57 S.Ct. 826, 830–31, 81 L.Ed. 1156, 1163–64 (1937); *Shoshone Tribe v. United States,* 299 U.S. 476, 489, 57 S.Ct. 244, 248, 81 L.Ed. 360, 365 (1937); *United States ex rel. Cook v. Parkinson,* 525 F.2d 120, 124 (8th Cir.1975), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

■ [¶ 23] Construing Article XVIII in the sweeping manner defendant advocates ig-nores the remainder of the Act. Such a result would be an extravagant misuse of the canons of statutory construction to salve modern sensibilities, especially given that the language in Articles I and II is so "precisely suited" to diminishment. Courts should not presume Congress intended an "absurd result." *Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1529 (11th Cir.1996); *In re Pacific–Atlantic Trading Co.,* 64 F.3d 1292, 1303 (9th Cir.1995). To give Article XVIII pointed emphasis allows it to negate the preceding seventeen articles, and that is a result contrary to the plain meaning of the rest of the Agreement.

## B. Historical Context

[¶ 24] Contemporary historical records are not as compelling as the statutory inferences, but they still add impetus to a judgment of diminishment. Commissioner of Indian Affairs Browning reported after reaching agreement, the land would be "restored to the public domain...." In 1896, two years after ratification, the Commissioner of Indian affairs wrote: "I have the honor to report that the lands in the *former* Yankton Indian Reservation ... were opened to settlement and entry...." (Emphasis added). The 1889 map created by the General Land Office of the Department of Interior shows the reservation as contemplated by the 1858 Treaty, but beginning in 1901, their maps eliminated both the Yankton and Lake Traverse (Sisseton) Reservations in conformance with their respective land sale agreements. Similarly, maps contained in the Annual Reports of the Commissioner of Indian Affairs after the 1894 ratification still show the Yankton Reservation in outline using the 1858 boundaries; but before the sale, these maps depicted the reservation in color, as were other nondiminished reservations. After the sale, the coloring was removed from the depiction of the Yankton Reservation. Likewise, Annual Reports of the Commissioner of Indian Affairs before the 1894 Act indicate the Reservation had 409.75 square miles. The 1896 and 1897 reports, however, show no acreage or square mileage amounts. *See Russ v. Wilkins,* 624 F.2d 914, 923–24 (9th Cir.1980); *DeCoteau, supra.* The His-

torical Atlas of South Dakota (1904) refers to the former Yankton Indian reservation.

[¶ 25] Both sides further rely on events and perceptions occurring many years after the 1894 Act as evidence to either prove or disprove diminishment. Later perceptions are of lesser value, as the Supreme Court has "been careful to distinguish between evidence of the contemporaneous understanding of the particular Act and matters occurring subsequent to the Act's passage." *Hagen,* 510 U.S. at 411, 114 S.Ct. at 965, 127 L.Ed.2d at 265. Most of the contemporary evidence, including maps, atlases, and the behavior of federal, state and tribal entities, all either explicitly or tacitly acknowledge diminishment. We think it noteworthy also that in the 1892 sale, the Tribe retained no land for itself as a seat of government from which to manage the domain defendant now claims to be under its jurisdiction. The Tribe's 1932 Constitution asserts no claim to the 1858 Treaty boundaries. Only in recent times has the Tribe attempted to assert some dominion in this region.

[¶ 26] The 1894 Congressional Record confers additional insight into the understanding of Congress. Representative McRae stated during debate concerning a series of reservation land purchases, including the Yankton Agreement, that the lands involved "will become part of the public domain under these agreements...." 53 CongRec 6425 (1894). In like manner, Representative Herman said the lands would become "a part of our public domain." 53 CongRec 6426 (1894). By returning lands to the public domain, Congress manifests an intent to diminish. *See Hagen,* 510 U.S. at 414, 114 S.Ct. at 967, 127 L.Ed.2d at 267 ("[W]e hold that restoration of unallotted reservation lands to the public domain evidences a congressional intent with respect to those lands inconsistent with the continuation of reservation status."); *DeCoteau,* 420 U.S. at 440 & 446, 95 S.Ct. at 1091 & 1094,

43 L.Ed.2d at 311 & 315. *Compare Solem,* 465 U.S. at 475, 104 S.Ct. at 1168, 79 L.Ed.2d at 453 (noting that reference to the public domain in a statute was supportive of diminishment, but not dispositive); *but see Hagen,* 510 U.S. at 413, 114 S.Ct. at 966–67, 127 L.Ed.2d at 266–67 (differentiating between the Act in *Solem,* which did not "restore" the lands to the public domain, and the Act in question, which did direct "all the unallotted lands within said reservation shall be restored to the public domain"). This was also the understanding of the Commissioner of Indian Affairs: the lands "will be restored to the public domain." [11]

[¶ 27] The United States has not attempted to exercise criminal jurisdiction in the area. All criminal offenses on nontrust land (91% of the region) are handled in state courts. Since 1895, the year the reservation was opened, South Dakota courts have consistently maintained, without intervention by federal or tribal authorities, civil and criminal jurisdiction within the former reservation boundaries. "[T]he single most salient fact is the unquestioned actual assumption of state jurisdiction over the unallotted lands...." *See Rosebud,* 430 U.S. at 603, 97 S.Ct. at 1371, 51 L.Ed.2d at 675. *See also United States v. Grey Bear,* 828 F.2d 1286, 1291 (8th Cir.1987), *dismissing in part, reversing in part on other grounds; affirming joinder issue on reh'g en banc,* 863 F.2d 572 (8th Cir.1988), *cert. denied,* 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990)("Jurisdictional history of disputed lands is an important factor because it reveals the traditional understanding of the Act, which has created justifiable expectations that should not be upset by a strained reading of the Act.").

### C. Result of Opening the Reservation

[¶ 28] Finally, the Supreme Court has recognized that, if congressional language and payment, as well as contemporary history,

---

11. Even if we assume congressional or administrative history regarding diminishment is not clear, we note such a position carried little weight with the *Rosebud* Court:

> The material presented by the parties reveals no consistent, or even dominant, approach to the territory in question. In light of the clear assumption of jurisdiction over the past 70

years by the State of South Dakota of the territory now in dispute, and acquiescence by the Tribe and Federal Government, this sporadic, and often contradictory, history of congressional and administrative actions in other respects carries but little force.

*Rosebud,* 430 U.S. at 604 n. 27, 97 S.Ct. at 1372 n. 27, 51 L.Ed.2d at 675 n. 27.

are inconclusive, the courts will look to "who actually moved onto opened reservation lands ... [as] relevant to deciding whether a surplus land Act diminished a reservation." *Solem*, 465 U.S. at 471, 104 S.Ct. at 1166, 79 L.Ed.2d at 451. "Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that *de facto*, if not *de jure*, diminishment may have occurred." *Id.* (citing *Rosebud*, 430 U.S. at 588 n. 3 & 604–05, 97 S.Ct. at 1364 n. 3 & 1372–73, 51 L.Ed.2d at 665 n. 3 & 675–76; *DeCoteau*, 420 U.S. at 428, 95 S.Ct. at 1085, 43 L.Ed.2d at 304–05).

[¶ 29] Once the Yankton Reservation was opened, non-Indian settlers quickly moved in.

> [T]he population of Charles Mix County increased by 103.4 percent between 1890 and 1900, and of the 8,498 persons residing in Charles Mix County in 1900, only 1,483 were Indian. By 1910, the Indian population in Charles Mix County had dropped to 1,345, and Indian land holdings had dropped dramatically by 1914. This evidence tends to show that the opened lands quickly lost their Indian character.

*Southern Missouri*, 890 F.Supp. at 887 (internal citations omitted). As Professor Hoover phrased it, the "Yanktons entered the 1890's with 430,405 [sic] acres. By the year 1930, they had divested themselves of ownership on 387,047 acres and retained only 43,358." Today, less than ten percent of the land within the 1858 Treaty boundaries is trust land. Over 600 miles of road in the area are maintained by county and township authorities. Only 22 miles are maintained by the Bureau of Indian Affairs. The state-chartered municipalities of Wagner, Lake Andes, Dante, Pickstown, Ravinia, and Marty all lie within the former boundaries. Non–Indians comprise over two-thirds of the population in the area.

[¶ 30] Our review of a current map depicting Charles Mix County showing trust lands and other Indian holdings illustrates how dispersed these tracts are in relation to the extensive territory held in fee.[12] Yet if we accept defendant's arguments, over 6000 citizens of Charles Mix County would presently find they have become residents of an Indian reservation. This region has not been considered a reservation by the general populace.[13] As Justice O'Connor wrote, "a contrary conclusion would seriously disrupt the justifiable expectations of people living in the area." *Hagen*, 510 U.S. at 421, 114 S.Ct. at 970, 127 L.Ed.2d at 271.[14]

[¶ 31] For over one hundred years, federal and state authorities have treated the Yankton Sioux Reservation as diminished. By agreement of tribal members and an Act of Congress, all unallotted reservation lands were sold to the United States and opened for settlement in 1895. The United States Supreme Court in 1914 referred to the very area now in question as no longer part of the reservation, and, in four separate decisions, this Court concluded diminishment occurred. Statutory language, contemporary negotiations, land ownership, population patterns and "jurisdictional history" all support diminishment. After more than a century, no other expectation is reasonable—using the Supreme Court's "clean analytical structure," the evidence is clear: the Yankton reservation has been diminished. South Dakota maintains jurisdiction in defendant's case.

---

**12.** Exhibit 906 dated October 25, 1995, shows allotments, tribal trust lands, other government lands, tribal fee-to-trust lands, and land held in fee. Fee lands largely dominate the area.

**13.** Even though *Perrin* cannot be considered *res judicata* as it did not specifically deal with diminishment, certainly its import created considerable reliance.

> If lower courts felt free to limit Supreme Court opinions precisely to the facts of each case, then our system of jurisprudence would be in shambles, with litigants, lawyers, and legislators left to grope aimlessly for some semblance of reliable guidance.

*McCoy v. Massachusetts Inst. of Technology*, 950 F.2d 13, 19 (1st Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992).

**14.** Even the statutory county boundary descriptions refer to the "former Yankton–Sioux Indian reservation," and have since the South Dakota Code of 1939. *See* SDCL 7–1–5 (SDC 1939, § 12.0106)(Bon Homme county boundaries); SDCL 7–1–12 (SDC 1939, § 12.0113)(Charles Mix county boundaries); SDCL 7–1–22 (SDC 1939, § 12.0123)(Douglas county boundaries); SDCL 7–1–34 (SDC 1939, § 12.0135)(Hutchinson county boundaries).

[¶ 32] ***III. Cross-examination on Prior Felony***

[¶ 33] Defendant complains the trial court erred in allowing the prosecutor to ask him on cross-examination if he had ever been convicted of a felony. He alleges prejudice because he was yet to be tried as a habitual offender and his admission could have been used against him. Yet after his conviction on this charge, the State dismissed the habitual offender information. We therefore deem the matter moot. *Hanson v. Hanson,* 318 N.W.2d 355, 356 (S.D.1982).

[¶ 34] Affirmed.

[¶ 35] MILLER, C.J., and SABERS, AMUNDSON, and GILBERTSON, JJ., concur.

