# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3893

_____

| | | |
|---|---|---|
| Yankton Sioux Tribe, and its individual members, | * | |
| | * | |
| | * | |
| Appellee, | * | |
| | * | |
| United States of America, on its own behalf and for the benefit of the Yankton Sioux Tribe, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Intervenor Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Matt Gaffey, States Attorney of Charles Mix County; Herman Peters, Member of the Charles Mix, South Dakota, County Commission; Bruce Bakken, Member of the Charles Mix, South Dakota, County Commission; Jack Soulek, Member of the Charles Mix, South Dakota, County Commission, | * | Appeals from the United States District Court for the District of South Dakota. |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Appellants, | * | |
| | * | |
| William Janklow, Governor of South Dakota; Mark W. Barnett, Attorney General of South Dakota, | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

_____

Gary Beeson, Landowner; City of      *
Dante; City of Geddes; City of Lake     *
Andes; City of Pickstown; City of      *
Platte; City of Ravinia; City of       *
Wagner; Harvey P. Weisser, doing     *
business as Weisser Oil Co., Inc.,     *
Individually,                   *
                           *

    Amici on behalf of Appellant,   *
                           *

Vine Deloria, Jr.; Philip S. Deloria;  *
Philip Lane, Sr.; Philip Lane, Jr.; James  *
Weddell, descendants of Francois    *
Deloria, Signatory to the Treaty of   *
1858, and descendants and relatives of  *
Philip J. Deloria,            *
                           *

    Amici on Behalf of Appellee.    *

————————

No. 98-3894

————————

Yankton Sioux Tribe, and its individual  *
members,                 *
                           *

    Appellee,              *
                           *

United States of America, on its own   *
behalf and for the benefit of the     *
Yankton Sioux Tribe,         *
                           *

    Intervenor Plaintiff - Appellee,  *
                           *

  v.                  *
                           *

Matt Gaffey, States Attorney of Charles  *

Mix County; Herman Peters, Member
of the Charles Mix, South Dakota,
County Commission; Bruce Bakken,
Member of the Charles Mix, South
Dakota, County Commission; Jack
Soulek, Member of the Charles Mix,
South Dakota, County Commission,

      Defendants,

William Janklow, Governor of South
Dakota; Mark W. Barnett, Attorney
General of South Dakota,

      Appellants.

_____

Gary Beeson, Landowner; City of
Dante; City of Geddes; City of Lake
Andes; City of Pickstown; City of
Platte; City of Ravinia; City of
Wagner; Harvey P. Weisser, doing
business as Weisser Oil Co., Inc.,
Individually,

      Amici on behalf of Appellant,

Vine Deloria, Jr.; Philip S. Deloria;
Philip Lane, Sr.; Philip Lane, Jr.; James
Weddell, descendants of Francois
Deloria, Signatory to the Treaty of
1858, and descendants and relatives of
Philip J. Deloria,

      Amici on Behalf of Appellee.

_____

No. 98-3896

_____

| | |
|---|---|
| Yankton Sioux Tribe, and its individual members; Darrell E. Drapeau, individually, a member of the Yankton Sioux Tribe, | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Appellees, | * |
| | * |
| v. | * |
| | * |
| Southern Missouri Waste Management District, a non-profit corporation, | * |
| | * |
| | * |
| Defendant, | * |
| | * |
| v. | * |
| | * |
| State of South Dakota, | * |
| | * |
| Third Party Defendant - Appellant. | * |
| _____ | * |
| | * |
| Gary Beeson, Landowner; City of Dante; City of Geddes; City of Lake Andes; City of Pickstown; City of Platte; City of Ravinia; City of Wagner; Harvey P. Weisser, doing business as Weisser Oil Co., Inc., Individually, | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Amici on behalf of Appellant, | * |
| | * |
| Vine Deloria, Jr.; Philip S. Deloria; Philip Lane, Sr.; Philip Lane, Jr.; James Weddell, descendants of Francois | * |
| | * |
| | * |

4

Deloria, Signatory to the Treaty of 1858, and descendants and relatives of Philip J. Deloria,

     Amici on Behalf of Appellee.

_____

No. 98-3900

_____

Yankton Sioux Tribe, and its individual members; Darrell E. Drapeau, individually, a member of the Yankton Sioux Tribe,

     Appellees,

  v.

Southern Missouri Waste Management District, a non-profit corporation,

     Appellant,

  v.

State of South Dakota,

     Third Party Defendant.

_____

Gary Beeson, Landowner; City of Dante; City of Geddes; City of Lake Andes; City of Pickstown; City of Platte; City of Ravinia; City of Wagner; Harvey P. Weisser, doing business as Weisser Oil Co., Inc.,

Individually,                                    *
                                                 *
    Amici on behalf of Appellant,            *
                                                 *
Vine Deloria, Jr.; Philip S. Deloria;            *
Philip Lane, Sr.; Philip Lane, Jr.; James        *
Weddell, descendants of Francois                 *
Deloria, Signatory to the Treaty of              *
1858, and descendants and relatives of           *
Philip J. Deloria,                               *
                                                 *
    Amici on Behalf of Appellee.             *

_____

Submitted: June 17, 1999
Filed: August 31, 1999

_____

Before RICHARD S. ARNOLD, MAGILL, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Before the court are several appeals from judgments concerning lands once recognized to be part of the Yankton Sioux Reservation. After the Supreme Court decided in South Dakota v. Yankton Sioux Tribe, 118 S. Ct. 789 (1998) (Yankton), that the reservation had been diminished at the end of the nineteenth century when the Yankton Sioux Tribe (Tribe) ceded land to the United States, that case was remanded for further proceedings.[1] In the district court the case was then consolidated with an

_____

[1]See Yankton Sioux Tribe v. Southern Missouri Waste Management Dist., 141 F.3d 798 (8th Cir. 1998). Earlier in the history of the case we upheld the district court's previous ruling that the reservation had been neither disestablished nor diminished. Yankton Sioux Tribe v. Southern Missouri Waste Management Dist., 890 F. Supp. 878 (D.S.D. 1995), aff'd, 99 F.3d 1439 (8th Cir. 1996), rev'd, 118 S. Ct. 789 (1998).

6

action brought by the Tribe to challenge state criminal jurisdiction over acts of tribal members on nonceded land within the original reservation boundaries. After an evidentiary hearing, the district court granted declaratory relief to the Tribe, its individual members, and its chairman Darrell Drapeau, and issued permanent injunctions enjoining state officials from exercising criminal jurisdiction over tribal members on "allotted or reserved lands." Yankton Sioux Tribe v. Gaffey, 14 F. Supp. 2d 1135, 1160 (D.S.D. 1998). The district court concluded that the reservation has not been disestablished and still includes all land within the original exterior reservation boundaries that was not ceded to the United States. See id. at 1159. The State of South Dakota (State), the Southern Missouri Waste Management District (District), and the individual named state and county officials appeal.[2]

We affirm the conclusion that the reservation was never clearly disestablished, but we reverse the conclusion that the original exterior boundaries of the reservation continue to have effect and that all nonceded lands remain part of the reservation. We also vacate the injunctions issued in the district court and remand the cases for further proceedings consistent with this opinion.

## I.

The original boundaries of the Yankton Sioux Reservation were defined in a treaty between the United States and the Yankton Sioux Tribe on April 19, 1858, 11 Stat. 743 (1858 Treaty), to include approximately 400,000 acres in what is now Charles

---

[2]The named defendants in the declaratory judgment action were Matt Gaffey, States Attorney of Charles Mix County and four members of the Charles Mix, South Dakota, County Commission (collectively "county officials"), as well as William Janklow, Governor of South Dakota and Mark W. Barnett, Attorney General of South Dakota (collectively "state officials").

Mix County, South Dakota.[3] The Supreme Court held in <u>Yankton</u> that the reservation was diminished by land ceded to the United States under an 1892 agreement, later ratified by Congress in 1894. Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 314-19 (1894 Act). The specific question before the Court in <u>Yankton</u> was whether the Tribe continued to have jurisdiction over a portion of the ceded land on which the District planned to build a landfill. The Court focused its discussion on that issue, holding unanimously that the Yankton Sioux Reservation had been diminished by the 1894 Act, at least to the extent of the tracts ceded to the United States, and that the State has primary jurisdiction over all ceded lands including the waste site. <u>See</u> <u>Yankton</u>, 118 S. Ct. at 805.

A.

The district court held an evidentiary hearing after <u>Yankton</u> was remanded and consolidated with the second case, and later ruled that the Yankton Sioux Reservation had not been disestablished and that it had only been diminished to the extent of the ceded lands. <u>Yankton Sioux Tribe v. Gaffey</u>, 14 F. Supp. 2d 1135 (D.S.D. 1998). The court noted that nothing in the explicit language of the 1892 agreement supports disestablishment, but that several articles support the conclusion that a diminished reservation remains intact. <u>Id.</u> at 1149-56. It also referred to the reports of the council

---

[3]The reservation was later surveyed and found to comprise 430,405 acres. <u>See</u> <u>Letter from the Commissioner of Indian Affairs to the Secretary of the Interior</u> (Dec. 9, 1983), <u>reprinted in</u>, S. Exec. Doc. No. 27, 53d Cong., 2d Sess., 1, 5 (1894) (1894 Commissioner Letter). It is estimated that under the Dawes Act, 167,325 acres were allotted and patented, and that an additional 95,000 acres were allotted after passage of the 1891 Act, leaving 168,000 acres of unallotted lands to be ceded through the 1894 Act. <u>See</u> <u>id</u>. The figures from the 1894 Commissioner Letter have been used by the parties throughout this litigation. Nevertheless, we note that the Court of Claims found in 1980 that the Yankton Sioux had ceded 201,110 unallotted acres through the 1894 Act. <u>Yankton Sioux Tribe v. United States</u>, 623 F.2d 159, 184 (Ct. Cl. 1980).

8

meetings with the Tribe, which do not discuss boundary changes or relinquishment of the reservation, but indicate that the 1892 agreement "memoralized only the consent of the Tribe to sell the surplus lands." Id. at 1145. The efforts to have the tribal members live close to white settlers were not intended to eliminate the reservation, but to help the Indians adapt to changed conditions. Id. at 1146-47. The Indians could have concluded from the representations made by the government negotiators that they would retain independent powers of self government over their lands. Id. at 1147. The district court held that the Yankton Sioux Reservation consists of all nonceded land "within the original exterior 1858 treaty boundaries," including those parcels now owned by non Indians, as well as Indian owned land and the land reserved from sale in the 1892 agreement for agency, school, and other tribal purposes. Id. at 1159. It concluded that primary criminal and civil jurisdiction over these lands belongs to the Tribe and the United States. Id. The court then issued declaratory judgments and enjoined state and county officials from exercising criminal law enforcement jurisdiction over tribal members alleged to have committed crimes on reservation land. Id. at 1159-60.

The State, the District, and the individual state and county officials appealed from these judgments in four separate appeals which have been consolidated by this court. A motion to expedite the appeals was also granted.[4] The four groups of

_____

[4]Several other motions have been filed. The County has moved to have the briefs to the Supreme Court lodged with the clerk. The Supreme Court briefs were made part of the record in the district court and are available online. The motion is denied since the briefs are already available. The Tribe and the United States have moved to strike portions of the District's brief and to strike the amicus briefs of Gary Beeson and the Cities of Dante, Geddes, Lake Andes, Pickstown, Platte, Ravinia, and Wagner (collectively Cities). In addition, the Tribe has moved to strike the amicus brief of Harvey P. Weisser. All the motions to strike allege that the challenged briefs refer to documents which are not part of the record on appeal and thus violate Fed. R. App. P. 10(a). With the exception of the affidavits of Jonelle J. Drapeau and Ed Zylstra, submitted as addenda to the amicus brief of the Cities, the challenged

9

appellants all present complementary arguments; they will be referred to collectively as "the State" when their arguments do not differ. The United States offers numerous arguments supportive of the Tribe's position; both appellees will be referred to collectively as "the Tribe" except where their arguments diverge. Each side basically argues that it is entitled to win on all issues left open by the Supreme Court in Yankton. The contentions between them primarily involve questions of law which we review de novo, although any factual findings are reviewed for clear error. See Fed. R. Civ. P. 52(a).

The State asserts that the 1894 Act disestablished the Yankton Sioux Reservation and that the only remaining Indian country within the original boundaries are "Indian allotments, the Indian titles to which have not been extinguished." 18 U.S.C. § 1151(c). It claims that the Supreme Court held in Yankton that the reservation boundaries did not remain intact and that it also implied that DeCoteau v. District County Court, 420 U.S. 425 (1975) (finding the Lake Traverse Reservation completely disestablished), controls the outcome here. The State interprets the text of the 1894 Act and its legislative history as illustrating the parties' intent to eliminate the reservation, and it finds further support for this position in the subsequent treatment of the area. It argues that immediately following the 1894 Act the Tribe itself did not hold any land in common, and the State's exercise of jurisdiction over the area has led landowners to develop reasonable expectations that their lands are not Indian country.

The Tribe argues that the district court correctly ruled that all the nonceded land within the original exterior reservation boundaries constitutes the present Yankton

_____

references do not deal for the first time with key factual material about which the opposing parties were unaware. The motions to strike portions of the District's brief and portions of the Weisser and Beeson briefs are denied. The motions to strike the Cities' brief are granted only to the extent that they seek to strike the Drapeau and Zylstra affidavits; these affidavits are stricken and have not been considered.

Sioux Reservation.[5]  The Supreme Court finding of diminishment in Yankton does not mean that the reservation boundaries did not continue as before, and it cites in support the Tenth Circuit's decision in Ute Indian Tribe v. Utah, 114 F.3d 1513 (10th Cir. 1997), cert. denied, 118 S. Ct. 1034 (1998).  The Tribe argues that DeCoteau does not control because each agreement and treaty with an Indian tribe is unique and must be examined in light of the circumstances surrounding its passage.  See Minnesota v. Mille Lacs Band of Chippewa Indians, 119 S. Ct. 1187, 1203 (1999).  It contends that the required clear statement of congressional intent to disestablish the reservation cannot be found in the text of the 1894 Act, the legislative history, or the historical circumstances surrounding its passage.  It argues instead that these documents show that Congress and the parties who negotiated the agreement intended all the nonceded land to retain its reservation status.

B.

The Yankton Court explicitly limited the scope of its holding to the status of the ceded lands.  Those "surplus" lands were intended by the 1892 agreement to be sold to white settlers, but a small amount of unallotted land was reserved from sale for use by the federal government.  This land was returned to the Tribe in 1929 and remains under its control.  See Act of February 13, 1929, ch. 183, 45 Stat. 1167.  The Supreme Court refrained from going beyond what was necessary for it to decide in Yankton, and it did not determine issues of current jurisdiction over the nonceded lands which were reserved from sale or were originally allotted to individual tribal members.  See Yankton, 118 S. Ct. at 805.

---

[5]The district court observed that the Tribe's Constitution as amended in 1990 claimed jurisdiction "extending to the original exterior 1858 boundaries."  Yankton Sioux Tribe v. Gaffey, 14 F. Supp. 2d at 1157.  But see Yankton, 118 S. Ct. at 804-05 (quoting the Constitution drafted in 1932 and amended in 1962).

11

Allotment is a term of art in Indian law.  It refers to the distribution to individual Indians of property rights to specific parcels of reservation.  See Affiliated Ute Citizens v. United States, 406 U.S. 128, 142 (1972).  The rights of use and occupancy to these lands were initially held in common by the Tribe, and the federal allotment policy sought to advance assimilation of the Indians by promoting its prevailing concept of individual land ownership.  The practice of allotting reservation land began with the 1887 passage of the General Allotment Act (Dawes Act), ch. 119, 24 Stat. 388 (1887) (codified as amended at 25 U.S.C. § 331).  Under the Dawes Act individual tribal members received patents for allotments of reservation land in parcels of up to 160 acres, to be held in trust by the federal government for twenty five years.  At the end of the trust period the United States would convey the allotment in fee to the individual allottee, who would then be subject to the civil and criminal laws of the State or Territory in which he resided.  Id. at 389-90.  At the time there was increasing pressure for western land for white settlers, and the Dawes Act provided that the Secretary of the Interior could negotiate with an Indian tribe to purchase all unallotted lands.  Id. The act was thus a two pronged effort to open up lands for white settlement and to encourage assimilation of the Indians.  It was considered a critical element in assimilation because the Indian concept of tribal control over land was fundamentally different from the European American concept of individual land ownership.  See Felix Cohen, Handbook of Federal Indian Law 131-32 (1982 ed.).

Approximately three-fifths of the Yankton Sioux Reservation was allotted under the Dawes Act and an act of February 28, 1891, ch. 383, 26 Stat. 794 (amending and extending the Dawes Act).  Although the trust period was initially set at twenty five years, it was terminated early for some allotments and extended for others.  At least eighty five percent of the land allotted on the Yankton Sioux Reservation eventually passed out of trust status; most of this land was sold in fee to non Indians.  The allotment policy was later repudiated by the passage of the Indian Reorganization Act in 1934, which prohibited further allotment of reservation land and indefinitely extended the trust period for the remaining trust lands.  Indian Reorganization Act, ch.

576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-77). The record is far from crystal clear about the specific lands remaining in trust on the Yankton Sioux Reservation, but it appears such land is interspersed in a checkerboard pattern with ceded lands and lands which have passed out of trust status and are now owned in fee.

The land ceded to the United States under the 1894 Act was subsequently sold to homesteaders, but the lands allotted to individual Indians continued to be held by the United States in trust for them. Many of these parcels soon lost their trust status. The Burke Act, ch. 2348, 34 Stat. 182 (1906) (codified at 25 U.S.C. § 349), permitted the government to take certain allotted lands out of trust status before the twenty five year time period expired and to grant the individual Indian allottees unrestricted fee title to the land. In addition, the trust period on lands which had been allotted within a few years of the passage of the Dawes Act in 1887 began to expire in the first part of the twentieth century. At that time it was understood that when an allotment passed out of trust status and the allottee received the land in fee, he also became subject to the civil and criminal laws of the State, see Dawes Act, 24 Stat. at 389-90, and could then sell his land to non Indians if he chose.

As federal policy began shifting away from allotment, the federal government acted to protect the trust status of the remaining allotments which had not yet lost that status. In 1916, an executive order was issued extending the trust period on all but approximately 150 of the parcels still held in trust on the Yankton Sioux Reservation. Exec. Order No. 2363, Apr. 20, 1916. The trust period for these allotments was extended again in 1926 and 1929, Exec. Order No. 4406, Mar. 30, 1926; Exec. Order No. 5173, Aug. 9. 1929, and then indefinitely in 1934 by the Indian Reorganization Act, § 2, ch. 576, 48 Stat. 984, 984 (1934) (codified at 25 U.S.C. § 462). As a result of this history, the majority of residents in many areas of the original Yankton Sioux

13

Reservation are non Indian.[6]  See U.S. Dept. of Commerce, Census Bureau, 1990 Census of Population, General Population Characteristics, South Dakota 29 tbl. 13 (1990 Census).

These appeals concern the undetermined current status of the 262,000 acres originally allotted to tribal members, some of which remain in trust, but the bulk of which have lost their trust status and are owned in fee by non Indians.  The Supreme Court explained in Yankton that "[t]he conflicting understandings about the status of the reservation, together with the fact that the Tribe continues to own land in common, caution us . . . to limit our holding to the narrow question presented: whether unallotted, ceded lands were severed from the reservation."  Id.  It answered that question by holding that the ceded lands were severed and the reservation diminished to that extent. Id.  We are called on now to address questions intentionally left open in Yankton—whether the Yankton Sioux Reservation was disestablished, and if not, whether the reservation has been diminished beyond the nonceded lands.

C.

Although the terms "diminished" and "disestablished" have at times been used interchangeably, disestablishment generally refers to the relatively rare elimination of a reservation while diminishment commonly refers to the reduction in size of a reservation.  Compare DeCoteau, 420 U.S. 425; with Rosebud Sioux Tribe v. Kneip,

---

[6]According to the 1990 Census, the overall area was approximately two-thirds non Indian, and although the tribal presence in the area has been increasing since the Fort Randall Casino was built, see Yankton, 118 S. Ct. at 804, it appears that non Indians own the bulk of the land within the original reservation boundaries. Municipalities such as Lake Andes and Wagner, for example, have non Indian majorities even though they are partially located on lands originally allotted to individual Yankton tribal members.  The Tribe has apparently recently purchased additional land in the area and has petitioned the United States to take it into trust.

430 U.S. 584 (1977); see also Yankton Sioux Tribe v. Southern Missouri Waste Management Dist., 99 F.3d 1439, 1443 n.4 (8th Cir. 1996). A finding of diminishment generally suggests that a discrete, easily identifiable parcel of land has been removed from reservation status. See, e.g., Rosebud Sioux Tribe, 430 U.S. at 615. The 168,000 acres by which the reservation was found diminished in Yankton are not contiguous, however, and no single boundary line can encompass these lands.

The question here is one of jurisdiction, that is to what extent the Tribe retains jurisdiction over any nonceded land within the original reservation boundaries. Congress clarified tribal jurisdiction by statute in 1948. For the Tribe to have jurisdiction over any land under the current statute it must qualify as Indian country pursuant to 18 U.S.C. § 1151. The statute defines Indian country to include all reservation land (§ 1151(a)), dependent Indian communities (§ 1151(b)), and allotments "the Indian titles to which have not been extinguished" (§ 1151(c)). If a reservation exists, the Tribe maintains jurisdiction over all land within its limits, § 1151(a),[7] but if there is no reservation, the State has primary jurisdiction over all land except allotments which continue to be held in trust, § 1151(c); see also, Alaska v. Native Village of Venetie, 118 S. Ct. 948, 953 (1998).

The parties agree that the Tribe has jurisdiction over allotted lands still held in trust by the federal government. The State, the District, and the individual state and county officials assert, however, that this jurisdiction falls under § 1151(c) and that no other lands within the original 1858 boundaries have retained their status as Indian

---

[7]It is undisputed that there are broad areas over which the Tribe cannot have exclusive jurisdiction regardless of territorial jurisdiction. For example, tribes do not have criminal jurisdiction over non Indians, see Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 195 (1978), or authority to regulate activities of nonmembers which do not affect tribal welfare and self-government unless the nonmembers have entered into consensual relations with the Tribe, see Montana v. United States, 450 U.S. 544, 563-67 (1981).

15

country under § 1151(a) because the reservation has been completely disestablished. The Tribe and the United States argue that the district court correctly ruled that the original exterior reservation boundaries retain effect and that all nonceded land within those boundaries constitutes the Yankton Sioux Reservation.

## II.

### A.

The heart of the matter involves whether Congress intended to disestablish the Yankton Sioux Reservation when on August 15, 1894 it finally ratified the 1892 agreement ceding certain tribal lands to the United States, see 28 Stat. at 314-20, or if not, whether it intended to diminish the reservation beyond the ceded lands. The 1892 agreement was the product of protracted negotiations between twenty four tribal representatives and the members of the Yankton Indian Commission (the Commissioners) who were appointed to procure the sale of the unallotted lands. The negotiations took place through a series of councils held from October through December of 1892. Although the immediate objective of the negotiations was the purchase of the unallotted lands, the Commissioners viewed this purchase as a step in the larger process of encouraging complete assimilation.

Commissioner Cole outlined the Commission's mission to the tribal representatives at the first council meeting. He explained that "The Great White father has sent us here to treat with you. He wants to give you a chance to sell your surplus lands . . . . He does not want you to sell your homes that he has allotted to you. He wants you to keep your homes forever." Council of the Yankton Indians (Oct. 8, 1892), transcribed in S. Exec. Doc. 27, 53d Cong., 2d Sess., at 49. Later in the negotiations, Commissioner Cole also encouraged the Tribe to adapt to western influences. He argued that the Tribe had no choice but to sell the unallotted lands, declaring: "The tide of civilization is as resistless as the tide of the ocean, and you have no choice but to

16

accept it and live according to its methods or be destroyed by it. To accept it requires the sale of these surplus lands and the opening of this reservation to white settlement." Council of the Yankton Indians (Dec. 17, 1892), transcribed in S. Exec. Doc. No. 27, at 81.

The Tribe proved reluctant to accept the offer to purchase its surplus lands. The Commission's reports show its work was made difficult by the Indians' distrust of the federal government and by factional divisions within the Tribe. See Report of the Yankton Indian Commission (March 31, 1893), reprinted in S. Exec. Doc. No. 27, at 7-25 (hereinafter Report). Some tribal members favored the sale and focused their energies on obtaining the highest possible price for the land, while others expressed strong opposition to any sale of tribal lands. See id. at 8-11. Key issues in the negotiations included the price to be paid for the lands, the payment of money due to individual Indians who had served as scouts for the United States, the continued payment of annuities pursuant to the 1858 Treaty, and the exclusion of alcohol from the ceded area. See id. at 12-21. As the Commission reported: "Careful inquiry into the conditions and requirements of these Indians soon revealed to us the fact that the purchase of the surplus land was but a small part of our mission and of minor importance to both the Indians and the Government, the provisions connected therewith for the future welfare of the Indians being of greater importance to them and to the Government than the sale of their surplus lands." Id. at 17.

In December of 1892, the Commission finally reached an agreement with the Tribe whereby it agreed in Articles I and II to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" for $600,000. 28 Stat. at 314-15. Article VIII provided that the portions of the ceded land currently occupied by the United States for "agency, schools, and other purposes" would be reserved from sale to settlers. 28 Stat. at 316. Article XVIII stated that the agreement did not abrogate the Tribe's rights under the 1858 treaty, 28 Stat. at 318, but this language pertained only to the right to receive

17

annuities, not to the reservation boundaries. See Yankton, 118 S. Ct. at 799. Several other sections of the agreement are relevant to these appeals, but many are not.[8]

By 1893 the Commissioners had collected the signatures required to show endorsement of the agreement by a majority of the adult male members of the Tribe. Congressional action to ratify the agreement was delayed, however, by the need to investigate allegations of fraud in the procurement of signatures. Congress finally ratified the agreement on August 15, 1894, along with two other similar surplus land sale agreements. 28 Stat. at 314-20. The 1894 Act incorporated the entire 1892 agreement, appropriated necessary funds, prescribed a punishment for violating the liquor prohibition, and reserved some sections for common school purposes. Id.

## B.

Our starting point in analyzing the 1894 Act is the Supreme Court's Yankton decision, which each side not surprisingly interprets in its own favor. The State asserts that Yankton provides an easy answer to the questions before the court because it shows that the reservation status of all land within the original boundaries has been lost.

---

[8]Articles VII, IX-XVI, and XIX-XX have little bearing on the issues here. Article VII provided for gifts of gold pieces to tribal members. 28 Stat. at 316. Article IX allowed uncultivated allotted land to be leased. Id. Article X allowed religious societies to purchase ceded land on which they were operating. Id. at 316-17. Article XII provided that the money paid under the agreement was not subject to claims by creditors. Id. at 317. Article XIII fixed the status of mixed bloods. Id. Article XIV required the government to complete the allotment process as soon as possible. Id. Article XV settled the claims of the Yankton scouts who had not been paid for their services. Id. Article XVI settled the Tribe's claim to the Pipestone Reservation. Id. at 317-18. Article XIX required a copy of the agreement to be placed in the Yankton "Agreement Book." Id. Article XX bound the parties upon ratification by Congress. Id.

Because the Court relied on <u>DeCoteau,</u> 420 U.S. 425, for the proposition that certain language in the 1894 Act was precisely suited to terminating reservation status, and because <u>DeCoteau</u> had found the Lake Traverse Reservation completely disestablished, it necessarily follows that the 1894 Act similarly completely disestablished the Yankton Sioux Reservation.  In contrast, the Tribe distinguishes <u>DeCoteau</u> and claims that <u>Yankton</u>'s holding of diminishment does not mean the reservation has been disestablished or its exterior boundaries changed.

Justice O'Connor, writing for the unanimous <u>Yankton</u> Court, articulated its precise holding as follows:

> In sum, we hold that Congress diminished the Yankton Sioux Reservation in the 1894 Act, that the unallotted tracts [which were ceded to the United States through that Act] no longer constitute Indian country, and thus that the State has primary jurisdiction over the waste site and other lands ceded under the Act.

<u>Yankton</u>, 118 S. Ct. at 805.  The Court explicitly declined to decide whether or not the 1894 Act altered the status of the nonceded lands.  As Justice O'Connor explained, "[w]e need not determine whether Congress disestablished the reservation altogether in order to resolve this case, and accordingly decline to do so."  <u>Id.</u>  Whether or not other land within the original reservation boundaries retained its reservation status thus remained an open question.

Although the Court used <u>DeCoteau</u> in reaching its conclusion of diminishment, the <u>Yankton</u> holding was explicitly more limited than that in the earlier case.  In <u>DeCoteau,</u> the Supreme Court analyzed the circumstances surrounding the ratification and the text of an agreement ceding certain lands on the Lake Traverse Reservation to the United States and held that the reservation there had been completely disestablished. <u>DeCoteau</u>, 420 U.S. at 427.  The background of the Lake Traverse agreement was very

different from that of the 1894 Act, however, because the tribal members there had expressed their clear desire to terminate their reservation. See DeCoteau, 420 U.S. at 432. In exchange they negotiated allotments for each individual, including married women. See Act of March 3, 1891, ch. 543, 26 Stat. 989, 1037-38. The circumstances surrounding the negotiation of the 1892 agreement with the Yankton Sioux and the difficulty in obtaining tribal votes to ratify it are significantly different, and there was no expression by the Indians of an intent to eliminate their reservation. Even more important, the content and wording of the agreements are very different, aside from the particular cession language the Supreme Court compared in Yankton. Compare 26 Stat. 1036-38, with 28 Stat. 314-18.

It is well established that similar treaty language does not necessarily have the same effect when dealing with separate agreements. Justice O'Connor writing for the Court in Minnesota v. Mille Lacs Band of Chippewa Indians, 119 S. Ct. 1187, 1203 (1999), warned against reaching this conclusion.

> The . . . argument that similar language in two Treaties involving different partes has precisely the same meaning reveals a fundamental misunderstanding of basic principles of treaty construction. . . . Th[e] review of history and the negotiations of the agreement is central to the interpretation of treaties.

Context has been found to play a similarly important role in interpreting the language of the surplus land acts.[9] See Solem v. Bartlett, 465 U.S. 463, 469 (1984). The

_____

[9]Although in 1871, Congress terminated treaty making with Indian tribes, the United States continued to negotiate agreements with them in much the same manner as it had negotiated treaties. See Felix S. Cohen, Handbook of Federal Indian Law 127-28 (1982 ed.). The 1892 agreement itself was also sometimes referred to as a "treaty." See, e.g., S. Exec. Doc. No. 27, 53rd Cong., 2d Sess. at 48 (statement of Commissioner Cole to tribal negotiations); 1894 Commissioner Letter at 5 (letter from

Commissioners negotiating on behalf of the United States told the Yankton tribal representatives that "[The Great White Father] wants you to keep your homes forever. He only wants you to sell your surplus lands for which you have no use." Council of the Yankton Indians (Oct. 8, 1892), transcribed in S. Exec. Doc. 27, 53d Cong., 2d Sess., at 49. In light of the significant contextual differences, we cannot assume that the Court's citation to DeCoteau means that that case controls the issues raised here.

The Yankton Court did make a number of explicit references to the status of the reservation boundaries. The Court found the 1894 Act distinguishable from those acts which it "has interpreted as maintaining reservation boundaries." Yankton, 118 S. Ct. at 799. The question before it was described as whether the 1894 Act "diminished the boundaries" of the reservation. Id. at 793. The Court distinguished situations in which states acquired primary jurisdiction over opened lands and "thereby diminished the reservation boundaries" from those in which the entire opened area remained Indian country even though non Indians were able to purchase land. Id. at 797-98 (citations omitted). In the Commission reports it found evidence that the 1894 Act involved alteration of "the reservation's character" and "a reconception of the reservation." Id. at 802. Some of the language was "reminiscent" of that used for the diminished Unitah reservation. Id. ("Congress would 'pull up the nails' holding down the outside boundary" of the reservation) (citation omitted). The Court went on to hold that the savings clause of Article XVIII "pertains to the continuance of annuities, *not the 1858 borders*." Id. at 800 (emphasis added). These references indicate the Court's understanding that the 1858 reservation boundaries did not remain intact following passage of the 1894 Act.

The Tribe is able to identify only one reservation which apparently continues to have its original boundaries even though some of the land within the boundaries has lost its reservation status—the Unitah Valley Reservation. The peculiar procedural history

Commissioner of Indian Affairs referred to the Secretary of the Interior).

of the litigation involving that reservation does not suggest that it is precedent for maintenance of the original exterior borders of the Yankton Sioux Reservation. Long after the Tenth Circuit held that the Unitah Valley Reservation had been neither disestablished nor diminished, Ute Indian Tribe v. Utah, 773 F.2d 1087 (10th Cir. 1985) (en banc), the Supreme Court decided in a different case that the reservation had been diminished, Hagen v. Utah, 510 U.S. 399 (1994). The Tenth Circuit then modified its Ute decision to the extent it was in direct conflict with Hagen, holding that the ceded lands did not retain reservation status, but it did not change its position regarding the status of the other lands within the original reservation boundaries. Ute Indian Tribe v. Utah, 114 F.3d 1513, 1520 (10th Cir. 1997). The Tenth Circuit indicated that the reason it went no further in its 1997 decision was because of concern for finality in light of years of reliance on its earlier holding. See id. at 1524, 1527.

Based on our interpretation of what the Court said in Yankton, the lack of controlling precedent to suggest the original reservation boundaries can be maintained despite the extent of the diminishment, and the record before the court which we discuss below, we conclude that the original exterior boundaries of the Yankton Sioux Reservation do not serve to separate Indian country from areas under primary State jurisdiction.

## C.

Congressional intent is the touchstone for analyzing whether the 1894 Act altered the status of the nonceded lands. See Rosebud Sioux Tribe, 430 U.S. at 586. After land is set aside for an Indian reservation, it retains that status until Congress explicitly indicates otherwise. See Solem, 465 U.S. at 470. Intent to diminish or disestablish a reservation must be "clear and plain." United States v. Dion, 476 U.S. 734, 738 (1986). Such intent must be "expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." Mattz v. Arnett, 412 U.S. 481, 505 (1973). Whether Congress intended to disestablish the reservation completely, or whether it

22

intended all or some of the nonceded land to retain its reservation status is complicated by the fact that modern distinctions between different categories of Indian country were not recognized by nineteenth century legislators who had a different understanding of the requirements for land to be classified as reservation land and/or Indian country.

As mentioned earlier, three different categories of land currently qualify as Indian country:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights- of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. This definition of Indian country was codified in 1948, and its key provisions have remained unchanged since that time. The State places great emphasis on the distinction this definition makes between land that is Indian country because it is part of a reservation, § 1151(a), and land which qualifies as Indian country under § 1151(c) because of its allotment status. An Indian allotment may be either a parcel held in trust by the federal government for the benefit of an Indian (a trust allotment) or a parcel owned by an Indian subject to a restriction on alienation in favor of the United States (a restricted allotment). See United States v. Stands, 105 F.3d 1565, 1571-72 (8th Cir. 1997). Under § 1151(c) both types of allotments are Indian country regardless of whether they are on or off an Indian reservation. 18 U.S.C. § 1151(c); see also Alaska v. Native Village of Venetie, 118 S. Ct. 948, 953 (1998). In contrast, lands that are owned in fee without such restrictions on alienation do not qualify as Indian country

under § 1151(c); but they may be classified as Indian country under § 1151(a) if they are within the boundaries of an Indian reservation. See Stands, 105 F.3d at 1572.

The parties all agree that lands originally allotted to individual tribal members that are still held in trust by the United States are Indian country within the meaning of § 1151(c), but they dispute whether the Yankton Sioux reservation still exists and whether any nonceded lands fit the current understanding of Indian country in § 1151(a). The State argues that although Congress intended some lands to retain their status as Indian country because of their status as allotments, it did not intend to maintain any reservation. The Tribe, on the other hand argues that the 1894 Act only altered the status of the ceded lands and that the reservation status of all other lands within the original 1858 boundaries was not changed.

Members of Congress in 1894 operated on a set of assumptions which are in tension with the modern definitions of Indian country, and the intentions of that Congress and of the 1892 negotiating parties are what we must look to here. At the turn of the century, Indian lands were defined to include "only those lands in which the Indians held some form of property interest: trust lands; individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians." Solem, 465 U.S. at 468. Lands to which the Indians did not have any property rights were never considered Indian country. The notion of a reservation as a piece of land, all of which is Indian country regardless of who owns it, would have thus been quite foreign. Congress in the late nineteenth century was operating on the assumption that reservations would soon cease to exist, see id, and on the belief that allotting lands, and purchasing those left unallotted, were steps in the process of eventually dismantling the reservation system. See United States v. Southern Pacific Transp. Co., 543 F.2d 676, 695 (9th Cir. 1976). The 1894 Congress would have felt little pressure to specify how far a given act went toward diminishing a reservation and would have had no reason to distinguish between reservation land and other types of Indian country. See id.

24

With this background in mind, see Yankton, 118 S. Ct. at 798, we consider whether the 1894 Congress intended to eliminate the Yankton reservation entirely or whether it intended to maintain the reservation status of some or all of the nonceded land. We apply the standard rules of interpretation for surplus land act cases. Each act must be analyzed individually, its effect depending on the language used and the circumstances of its passage. See Solem, 465 U.S. at 469. The statutory language provides the most probative evidence of congressional intent. See Rosebud Sioux Tribe, 430 U.S. at 586. Also relevant are the legislative history of the act and its historical context, including events surrounding the statute's passage which shed light on the contemporaneous understanding of it. See Hagen v. Utah, 510 U.S. 399, 411 (1994). Treaties with Indians are also interpreted to give effect to the terms as the Indians themselves would have understood them. See Mille Lacs Band of Chippewa Indians, 119 S. Ct. at 1200. To a lesser extent, the subsequent treatment of the area is also relevant. See Yankton, 118 S. Ct. at 798. Under certain circumstances the "justifiable expectations" of the parties are considered, see Rosebud Sioux Tribe, 430 U.S. at 605, as well as changes in the demographics of the area, see Hagen, 510 U.S. at 411 All ambiguities are resolved in favor of the Indians, and neither diminishment nor disestablishment will be found lightly. See Yankton, 118 S. Ct. at 798; Hagen, 510 U.S. at 411.

The primary purpose of the 1892 agreement, which was ratified by the 1894 Act, was to cede the unallotted surplus lands on the Yankton Sioux Reservation to the United States. The specific language accomplishing this goal is found in Articles I and II of the agreement. Article I states that the Tribe agrees to "cede, sell, relinquish, and convey to the United States all their [sic] claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation." 28 Stat. at 314. Article II provides that the United States agrees to pay the Tribe $600,000 "in consideration for the lands ceded, sold, relinquished, and conveyed to the United States." Id. at 315. The text of these articles refers explicitly only to the ceded lands.

The State argues that the cession of these lands necessarily terminated the reservation status of all lands within the original 1858 boundaries. It contends that allotments were intended to be temporary in nature and cannot alone constitute a reservation. It believes the failure of the Tribe to retain ownership in common of land for itself means that the reservation was disestablished. The State asserts that uncertainty about whether the Tribe owned land in common in 1894 was the key point which kept the Yankton Court from finding the reservation disestablished. Now that it has produced evidence to resolve that question in its favor and the district court has found that the Tribe did not reserve any lands in 1892 to be held in common, see Yankton Sioux Tribe v. Gaffey, 14 F. Supp. 2d at 1154, the reservation must be found disestablished. We cannot agree that the Supreme Court expected this point alone to be dispositive, however, for it said that among the factors causing it to limit its holding was "the fact that the Tribe *continues* to own land in common." Yankton, 118 S. Ct. at 805 (emphasis added), an apparent reference to the Tribe's current landholdings.

The State also relies heavily on what it views as the background understanding of the 1894 Congress to support its conclusion that cession of all land held in common by the Tribe necessarily terminated the reservation status of everything within the original 1858 boundaries. It cites the comment in Yankton that around the turn of the century "'[t]he notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar.'" Id. at 798 (quoting Solem, 465 U.S. at 468). It is important to keep in mind that it is not clear that the reference in Solem to "tribal ownership" meant ownership of land in common by the Tribe, as opposed to ownership by a tribal member.[10] In any event Indian tribes did not hold ownership rights to land, but rather

---

[10]A careful reading of the relevant passage in Solem suggests that the Court used the terms "reservation lands" and "Indian lands" interchangeably to refer to all lands in which Indians had a property interest when it was discussing the assumptions of Congress in the early nineteenth century. Solem contrasted lands that "retained reservation status" from those that were "divested of all Indian interests," and the Court appeared to use both the words "reservation lands" and "Indian lands" to refer to lands

26

rights to exclusive use and occupancy of land.  See Spalding v. Chandler, 160 U.S. 394, 403 (1896).  Although the background understanding of the 1894 Congress "informs our inquiry," id., courts have not been willing to extrapolate from general legislative assumptions and expectations of the late nineteenth century to find in each surplus land act a specific congressional purpose to  remove all lands not under Indian control from reservation status.  See Solem, 465 U.S. at 468-69.  If Congress' general understanding that tribal ownership was a necessary component of  reservation status controlled, all land which passed out of tribal ownership would necessarily be found to have lost its reservation status—a conclusion the Supreme Court has explicitly refused to adopt.  Id.

More persuasive arguments regarding the interpretation of Articles I and II are drawn from evidence which places the Act in its full historical context and sheds light on the parties' contemporaneous understanding of the impact of the cession.  The State argues that this evidence shows that the "'cession' and 'sum certain' language" in Articles I and II, see Yankton, 118 S. Ct. at 798 (citation omitted), was intended to terminate the reservation status of all lands within the original reservation boundaries.   The Tribe argues that these same documents establish that the parties understood that these articles would only terminate the reservation status of the ceded lands.

The Commissioners who negotiated the agreement on behalf of the United States retained detailed records of the councils held to negotiate the sale of the unallotted lands and prepared an extensive report which was submitted to Congress along with the agreement.  See S. Exec. Doc. No. 27, 53d Cong., 2d Sess. (1894).  Two key points can be discerned from these records.  First, the Commissioners indicated to the tribal

that retained their reservation status.  Solem, 465 U.S. at 468. "Indian lands" included: "[o]nly those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians."  Id.  Finally, the Court specifically pointed out that "only in 1948 did Congress uncouple reservation status from *Indian ownership*." Id. (emphasis added).

27

representatives that their primary objective was the purchase of the *unallotted* lands. Second, the Commissioners emphasized to the tribal representatives that tribal members needed to move into the modern, post tribal era and that the sale of the unallotted lands would constitute one step toward that ultimate goal. See id.

The Commissioners repeatedly emphasized that they had one primary purpose. Commissioner Adams, for example, introduced the Commission's purpose, stating that "we . . . understand that you own, outside your allotments, a large quantity of land in common. It is this land that you own in common that we were appointed by the Great Father to talk to you about." Council of the Yankton Indians (Oct. 8, 1892), transcribed in S. Exec. Doc. 27, 53d Cong., 2d Sess., at 48. They also indicated that the tribal leadership would retain some governing powers, suggesting for example, that: "It might be, after you sold your lands, you could have this reservation organized as a separate county. If this could be done—I do not say it can —you could govern your own people in your own way, so long as you obeyed the laws of the State ." Id. The Yankton Sioux could have interpreted such comments to indicate that their powers of self government, which at that time were limited to lands in which Indians had a property interest, would not be further limited and that the cession of the unallotted lands would not alter the Tribe's control over the lands retained by the Indians. Although the Commissioners were careful not to make promises concerning the scope of tribal self government powers, the references to a continuing tribal government suggest the parties did not intend to disestablish the reservation.

The Commissioners' introductory remarks, however, also emphasized that the tribal members needed to adapt to the modern era and urged them to allow settlers on the then unallotted lands so that they could learn from the white man how to farm, conduct business, and be citizens. Id. In line with the assumption that the reservation system would soon be outmoded, Commissioner Cole admonished:

28

In your old life the tribal condition was a necessity. It united you and protected you and made you strong. But you are now living under new conditions and you must drop your old forms which are not suited to these conditions and take up new forms suited to your new mode of life. The Government seeing this sent an allotting agent to you to help you divide you land and select your homes. . . .

Now that you have your homes and that your allotted lands are more than you can make use of, you have sent word to Secretary Noble that you desire to sell your surplus lands and get money to help you to improve your farms and build good houses and buy stock. The Great Father and his Great Secretary . . . have sent us here to buy [the] surplus lands for homes for white men who will settle among you; who will live peaceably and neighborly with you; who will cultivate these surplus lands and make your allotted lands more valuable.

Id. at 50. At the time the cession agreement was negotiated, the allotment process was not even complete; many allotments remained to be finalized. See 1894 Commissioner Letter at 5. The concept of individual property ownership was new to the Indians, and although it was hoped allotment would stimulate individual effort to improve the land, there is little indication that this concept had taken root. See Report of the Yankton Indian Commission (Mar. 31, 1893), reprinted in S. Exec. Doc. No. 27, at 7, 14-16 (1893 Report). The Indians thus could easily have understood these statements to mean that the status of the lands that had been allotted to them would not be changed by the agreement, and that they would retain control over these lands as in the past.

The Commission's report to Congress highlights its hope that assimilation would be promoted by the allotment of reservation lands and the cession of those that remained unallotted, but the report also suggests the parties recognized a division between unallotted and ceded lands. The Commission indicated that "now that [the members of

29

the tribe] have been allotted their lands in severalty and have sold their surplus land – the last property bond which assisted to hold them together in their tribal interest and estate – their tribal interests may be considered a thing of the past."  Report of the Yankton Indian Commission (Mar. 31, 1893), reprinted in S. Exec. Doc. No. 27, at 7, 19 (hereinafter Report).  The Supreme Court found this language supported its conclusion that the 1894 agreement divested the Tribe of jurisdiction over the ceded lands.  Yankton, 118 S. Ct. at 803.

This same report also indicates, however, that the ceded and nonceded lands would be treated differently, at least for as long as the Indians retained property in common, suggesting that the divestiture of jurisdiction was not complete.  In explaining to Congress why they had such difficulty negotiating a price for the land, the Commissioners explained.

> On the matter of price we encountered much difficulty.  Two important factors in determining the value of these lands seem to have been wholly overlooked by both the Indians and their friends: First, That the Indians were not selling their whole reservation, but less than two-fifths of it, and that more than three-fifths of it would remain in their possession for such cultivation and improvement as Indians will give to it, and free from taxation for twenty five years; second, that the surplus lands are not in one body, but scattered over the reservation and mixed up with the allotted lands of the Indians.  We think the value of these surplus lands per acre would be doubled if the whole reservation were being disposed of by the Indians, to be equally improved by white people and uniformly taxed.

1893 Report at 13.  This report is evidence of the parties' understanding that only a portion of the reservation was being separated at that time, and also suggests that the negotiations were complicated by  the Indians' differing conception of land use and property ownership.

30

The Commission's reports do not describe any reservation boundaries or mention any transfer of the Yanktons' tribal sovereignty. See Yankton Sioux Tribe v. Gaffey, 14 F. Supp. 2d 1135, 1148 (D.S.D. 1998). Instead, these reports show only that the Commissioners emphasized the need for the Indians eventually to become completely assimilated into the "modern era" and encouraged them to sell their surplus lands to aid in this process. Although the sale of the surplus lands was characterized as a step required by changes of the modern era, it was not directly equated with the loss of control over other lands. In sum, the plain language of the text of Articles I and II only refers to the ceded lands, and the reports of the Commission do not indicate the "clear and plain" congressional intent required to show the reservation status of all nonceded lands was terminated by this Act. The evidence is thus insufficient to establish that the "cession and sum certain" language of Articles I and II was intended to disestablish the reservation.

There are other provisions of the agreement which may shed light on the intended impact on unallotted lands. The State directs our attention to Articles III-VI and XI, which established a complex system for the payment of the purchase price of $600,000. 28 Stat. 315-17. It points out that some aspects of the payment plan were linked to the twenty five year trust period and argues that this shows that such lands retained their Indian country status because the Indian title to the allotments had not yet been extinguished. The Tribe, on the other hand, argues that the provision allowing for the Act's creation of a fund to support schools, courts, and other tribal institutions evidences congressional intent to preserve tribal self government within the 1858 boundaries and to maintain reservation status for the allotted lands.

According to the agreement for payment, $100,000 was to be divided among the members of the tribe per capita, and $500,000 was to be placed into an interest bearing account for the benefit of the Tribe. Article V provided that interest from that account could be used to set up a fund to meet basic needs of the tribal members, or it would be distributed on a per capita basis to tribal members. 28 Stat. at 315. After the trust period

31

expired on the allotted lands, any monies remaining in the original account or in the fund were to be disposed of by the Secretary of the Interior for the benefit of the Tribe. Arts. IV, V, 28 Stat. at 315. Article IX provided that the allotted land of any tribal members who died without heirs within twenty five years was to be sold and the proceeds added to the fund provided for in Article V. 28 Stat. at 315-17.

The Tribe places great emphasis on Article V because it specifically provided that some of the interest due on payment funds might be set aside and used "for the care and maintenance of such orphans, and aged, infirm, or other helpless persons of the Yankton tribe of Sioux Indians. . . ; for schools and educational purpose for the said tribe; and for courts of justice and other local institutions for the benefit of said tribe." 28 Stat. at 315. Institutions that might have qualified for such monies included the Indian police force and the Court of Indian Offenses, both of which the district court found still operative at the time of ratification. See Yankton Sioux Tribe v. Gaffey, 14 F. Supp. 2d, at 1150. It is undisputed that this optional fund was never actually created, but the fact that it was provided for in the statute has relevance on the question of intent. Article V clearly foresaw continued tribal activity in providing for the needs of the Yankton Sioux in terms of education, justice, and "other local institutions." Nevertheless, section 2 of the article also contemplated a future in which such a fund would not be needed when the Indians might receive "complete title to their allotted lands and . . . assume[] all duties and responsibilities of citizenship." 28 Stat. at 315.

The prohibitions on the sale of alcohol found in Article XVII provide further insight into the parties' intent. This article provides that "no intoxicating liquors nor other intoxicants shall ever be sold or given away upon any of the lands by this agreement ceded and sold to the United States, nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians." 28 Stat. at 318. The Supreme Court found this provision indicated that the parties intended to diminish the reservation by the Act of 1894, reasoning that the language would have been superfluous if all lands were to retain their reservation status. See Yankton, 118 S. Ct. at 801. The language

32

would also have been superfluous if the parties had intended to disestablish the Yankton Sioux Reservation. The Court found it significant that the provision "signal[ed] a jurisdictional distinction between reservation and ceded land. Id." In this article the parties acknowledged the continued existence of two distinct categories of land to which different laws might apply.

Article VIII, the "agency lands provision," provides strong evidence that a reservation was expected to remain in existence. This provision provides that "[s]uch part of the surplus lands hereby ceded and sold to the United States, as may now be occupied by the United States for agency, schools, and other purposes, shall be reserved from sale to settlers until they are no longer required for such purposes." 28 Stat. at 316. As the Supreme Court noted, this provision "counsels against finding the reservation terminated." Yankton, 118 S. Ct. at 801. The Court cited its prior interpretation of virtually identical language in Solem where it reasoned that it would be "'difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation.'" Yankton, 118 S.Ct. at 801 (citing Solem, 465 U.S. at 474). Congress' expectation that the federal government would continue to have a significant presence in the area for the welfare of the Tribe indicates that some lands were expected to remain outside of primary state jurisdiction.

The State argues that the retention of this land is irrelevant to our analysis because the provision does not specify that such reserved land remained in reservation status, and the federal government's continuing obligations were based on the fact that Indian allottees held patents for their land in trust. Nothing in Article VIII specifically ties the government's retention of these lands to the trust period, however, or indicates that its obligations were expected to end when the trust period expired. Instead, the Article says that the lands would be retained "until they are no longer required for such purposes." 28 Stat. at 316. And in 1929 the lands were returned to the tribe for common purposes.

33

Act of February 13, 1929, ch. 183, 45 Stat. 1167 (explicitly providing that the lands could not be allotted).

Neither the text of the 1894 Act nor evidence of the parties' contemporaneous understandings clearly establish an intent to disestablish the Yankton Sioux Reservation. The reports indicate that the Commissioners' statements may have sent mixed messages to the Indians in that they sometimes talked about continuing tribal control over land and sometimes suggested that the property bonds of the Indians would be severed. The Indian understanding of land use and control differed from the European American notion of individual property ownership and the Commissioners mixed messages could have led the Yankton Sioux to believe that their control over the lands retained in trust for individual members would remain unchanged. See Felix Cohen, Handbook of Federal Indian Law 131-32 (1982 ed.); see also Michael L. Ferch, Indian Land Rights, 2 Transnat'l L. & Contemp. Probs. 301 (1992) (comparing the Indian view of property rights with the western view).

The Act could not foresee all that would happen in the future with population movement, state development, and changing Indian policy, but it contained provisions showing concern for future interests of the Indians in common, as well as provisions recognizing that conditions were sure to change as white settlers moved in to the opened reservation with the expectation of state support. In the Act, the federal government reserved land to provide for tribal needs in Article VIII, and the parties recognized a distinction between ceded and reservation lands in Article XVII. The Act did not leave all land within the original exterior reservation boundaries under tribal control, see Yankton, 118 S. Ct. at 805, or define new reservation boundaries, and nothing in its text or the circumstances surrounding its passage suggests that any party anticipated that the Tribe would exercise jurisdiction over non Indians who purchased land after it lost its trust status. Some articles of the Act reflect the parties' assumption that an allottee who received full title at the end of the trust period would become subject to the civil and criminal laws of the State or territory in which he resided. 24 Stat. at 389-90. Article

34

V indicates that the fund which could be established to provide for helpless and infirm tribal members would no longer be needed "[w]hen the Yankton tribe of Sioux Indians shall have received from the United States a complete title to their allotted lands and shall have assumed all the duties and responsibilities of citizenship." 28 Stat. at 315. Congress also added the so-called "school sections clause" to the Act which parallels language in the South Dakota enabling act, Act of Feb. 22, 1889, 25 Stat. 679, and provided that certain sections of the ceded land would be reserved for common schools, 28 Stat. at 319. This suggests that as more white settlers came on to the opened lands, increased state involvement on their behalf was expected, and the jurisdiction of the State was expected to increase over time.

In sum, the 1894 Act did not clearly disestablish the Yankton Sioux Reservation, but it intended to diminish the reservation by not only the ceded land, but also by the land which it foresaw would pass into the hands of the white settlers and homesteaders. The text of the 1894 Act, read in its full historical context, establishes that the intent was to cede certain lands to the United States and to open areas of the Yankton Sioux Reservation to white settlers, as well as to reserve land to be used to care for continued tribal interests. Until the Indian allottees would receive their lands in fee and the trust period over them would end, they could not convey land to non Indians. It was then foreseen that the trust period over the allotments would at some point come to an end, but we note that some of this allotted land apparently remains in trust to this very day.

D.

The treatment of the Yankton area in the years following the passage of the Act provides further evidence that the nonceded lands retained their reservation status until they passed out of trust. Although evidence regarding the subsequent treatment of the area cannot control when there is strong textual and contemporaneous evidence regarding the status of the land in question, Yankton, 118 S. Ct. at 804, courts have consistently recognized that events occurring after the passage of a surplus land act may shed light

35

on the contemporaneous understanding of the act, see Solem, 465 U.S. at 4701; see also Hagen, 510 U.S. at 411. Established jurisdictional patterns may also over time lead to the development of justifiable expectations which the Supreme Court has found worthy of consideration. Rosebud Sioux Tribe, 430 U.S. at 604-05.

Congress took a definitive and considered step when it decided to return title to the Yankton Sioux Tribe for the lands that had been reserved for federal use in the 1894 Act. See Act of February 13, 1929, ch. 183, 45 Stat. 1167.[11] Congress not only returned the land to the Tribe, but also specifically provided that the land would not become available for allotment purposes. Id. Although "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," Yankton, 118 S. Ct. at 803, the return of these lands to tribal control suggests that the reserved lands were always intended to provide a property site for organized efforts to provide aid and education to tribal members so long as they were needed. This action indicates that at the close of the era, the United States government understood, as it continues to argue today, that the Yankton Sioux reservation was not completely disestablished in 1894.

Longstanding divisions of jurisdictional authority have also been entitled to considerable weight in similar boundary disputes. See Rosebud Sioux Tribe, 430 U.S.

---

[11]References cited by the parties to administrative documents and maps, which either refer to the Yankton Sioux Reservation or lack any such reference, were found by the Supreme Court to have "limited interpretive value." Yankton, 118 S. Ct. at 803-04. The use of the term "Yankton Sioux Reservation" in such documents, without more, cannot be said to be a considered jurisdictional statement regarding the specific status of the remaining Indian lands. Moreover, problems associated with relying on the presence or absence of a cite on a map is illustrated by the failure of a prestigious map maker to include the states of North Dakota, South Dakota, Oklahoma and parts of Minnesota, Iowa, and Kansas in one world atlas. See Richard J. Margolis, "How the West Was Lost," The New Leader, p. 13 (Nov. 27, 1989) (discussing the omission of these states from Rand McNally's 1989 Photographic World Atlas).

at 605 n.28.  The State has presented uncontroverted evidence showing that the State has assumed primary jurisdiction over unallotted lands that have passed out of trust status. The Tribe has not established reason to doubt the veracity of the various letters and reports of several Superintendents of the Yankton Agency and Commissioners of Indian Affairs which indicate that the federal government only exercised jurisdiction over allotted lands held in trust and the agency reserve.  In addition, three former United States Attorneys for the District of South Dakota testified that during their tenures, which collectively cover most of the years between 1965 and 1991, the federal government continued to exercise jurisdiction only over those lands actually held in trust.  The Tribe has presented evidence indicating that it maintained a tribal police force and an independent judicial system following the passage of the 1894 Act.[12]  It has also presented evidence suggesting that the State did not always allocate sufficient resources to enforce its laws consistently within the original reservation boundaries.  While this evidence may show problems of enforcement, it does not prove that the Tribe or the federal government exercised jurisdiction over the whole area.  On the record before the court, the Tribe has not presented any new evidence to undermine the Supreme Court's statement that the Tribe has not asserted civil, regulatory, or criminal jurisdiction over lands other than those held in trust, Yankton, 118 S. Ct. at 804, and "the longstanding assumption of jurisdiction by the State over [a predominately non-Indian area creates] justifiable expectations which should not be upset by [a] strained . . . reading of the Acts of Congress," Rosebud Sioux Tribe, 430 U.S. at 604-05.

## III.

---

[12]The Tribe's position on this evidence is not contested.  A court of Indian offenses was in existence at the time of the treaty in 1894.  Although it was abolished in 1909, its duties were taken over by the Superintendent until it was reinstated in 1943. The court was replaced in 1945 with the Yankton Sioux Tribal Court, but there is no evidence that this court ever exercised jurisdiction over lands owned by non-Indians.

In 1858 Congress designated the Yankton Sioux Reservation as an area set aside for the exclusive use of the Yankton Sioux Tribe. The status of the lands which initially comprised this reservation were later altered when the federal government allotted lands previously held in common by the Tribe to individual Indians and then purchased the remaining unallotted lands to open them up for homesteading. In Yankton, the Supreme Court held that the cession of the unallotted lands in 1894 removed these lands from the reservation and indicated that the 1858 boundaries were not maintained. The text of the 1894 Act and evidence regarding the parties' contemporaneous understanding of it establish that the reservation was maintained, but do not define its precise boundaries. When viewed in its full historical context, however, it is clear that the parties did not intend for the tribe to retain control over allotted lands which passed out of trust status and into non Indian hands.

For these reasons, we hold that the Yankton Sioux Reservation has not been disestablished, but that it has been further diminished by the loss of those lands originally allotted to tribal members which have passed out of Indian hands. These lands are not part of the Yankton Sioux Reservation and are no longer Indian country within the meaning of 18 U.S.C. § 1151. We recognize that the original exterior treaty boundaries of the reservation have not been maintained. See Yankton, 118 S. Ct. at 799-800. We also assume that land now owned in fee by individual Indians is not under tribal jurisdiction unless it is found to be "within the limits of [the] Indian reservation." 18 U.S.C. § 1151(a). On the record before the court, however, we cannot define the precise limits of the reservation which remains.

The current amount of Indian trust land on the Yankton Sioux Reservation is unclear from the record. Since both sides have followed an all or nothing strategy (the State arguing disestablishment and the Tribe claiming maintenance of the 1858 boundaries), neither side spent much time developing the record on the specifics of this trust land. The South Dakota Supreme Court has said that the reservation was reduced by the 1894 Act "from a 410 square mile (430,495 acre) sanctuary down to what is

38

presently scattered Indian holdings of approximately 40,000 acres." South Dakota v. Greger, 559 N.W. 2d 854, 859 (1997). It also stated that in modern times both Indians and non Indians refer to the reservation "as a 'mile square'" id., in reference "to the tribal headquarters area at Marty," id. at 859 n.4. The Supreme Court later stated in Yankton that currently less than ten percent of the 1858 reservation lands remains "in Indian hands," 118 S. Ct. at 804, and that within the original exterior reservation boundaries, there are only 30,000 acres held in trust for individual Indians, and 6,000 acres of "tribal lands," id. at 796.

References in the briefs in these cases and in judicial opinions are not always clear about what is meant by trust land. The term is variously used to include 1) the land reserved to the federal government in the 1894 Act and later returned to the Yankton Tribe, 2) land allotted to individual Indians that remains held in trust, and 3) land taken into trust under the Indian Reorganization Act of 1934. Efforts at oral argument to get precise statements from the parties identifying what trust land remains were unsuccessful. At this time we hold only that the land reserved to the federal government in the 1894 Act and then returned to the Tribe continues to be a reservation under § 1151(a), and we leave it to the district court on remand to make any necessary findings relative to the status of Indian lands which are held in trust.

The judgments of the district court are affirmed in so far as the court concluded that the Yankton Sioux Reservation has not been clearly disestablished, but the judgments are reversed in so far as the court concluded that the 1858 exterior reservation boundaries remain intact and that all nonceded lands remain part of the reservation. The permanent injunctions entered by the district court are vacated, and the cases are remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.